**Stephen Tim NEAL, Sr. and Laura Neal, as the Surviving Parents of Stephen Tim Neal, Jr., Appellants,**

v.

**DOW AGROSCIENCES LLC f/k/a Dow Elanco, The Dow Chemical Company, and B & G Chemicals and Equipment Company, Appellees.**

No. 05–01–00254–CV.

Court of Appeals of Texas, Dallas.

March 20, 2002.

David Scott Carlile, The Carlile Law Firm, L.L.P., Marshall, for appellants.

Scott Summy, Cooper & Scully, Dallas, Frank L. Hill, Debora McWilliams Alsup, Thompson & Knight, P.C., Austin, Joseph Eaton, Barnes & Thornburg, Indianapolis, IN, Charles A. Watson, Todd M. Lonergan, Coats, Rose, Yale, Ryman & Lee, P.C., Houston, for appellees.

Before Justices MORRIS, WHITTINGTON, and RICHTER.

## OPINION

Opinion by Justice WHITTINGTON.

Stephen Tim Neal, Sr. and Laura Neal, as the surviving parents of Stephen Tim Neal, Jr., appeal the summary judgment granted in favor of Dow Agrosciences LLC f/k/a Dow Elanco, The Dow Chemical Company, and B & G Chemicals and Equipment Company (collectively, "Dow"). In one issue on appeal, the Neals contend the trial judge abused his discretion in granting Dow's motion to strike the Neals' medical causation expert and causation evidence.[1] We affirm the trial court's judgment.

### BACKGROUND

The Neals lived in an apartment from September 1993 to February 1995. During that time, the apartment unit became infested with ants. In response to the Neals' numerous complaints, the management of the complex requested the apartment be sprayed. During the five-month period from September 1993 until January 1994, the apartment was sprayed several times for ants. Laura was pregnant at the

---

1. The Neals originally briefed five issues for this Court's review. During oral argument, however, they abandoned issues two through five. Therefore, we neither discuss nor decide those issues in this opinion.

time and later gave birth to Neal, Jr. Several months after his birth, Neal, Jr. was diagnosed with malignant ependymoma (a malignant brain tumor) and subsequently died.

The Neals sued Dow, Intercity Investments, Inc. d/b/a Green Valley Apartments, and Scott Rackley d/b/a Mustang Pest Control for negligence, strict products liability, violations of the Texas Deceptive Trade Practices Act, intentional infliction of emotional distress, fraud, fraudulent concealment, and wrongful death. The Neals alleged (i) their apartment was sprayed repeatedly with Dursban, a pesticide containing chlorpyrifos, (ii) Dow manufactured, distributed, and/or supplied Dursban, and (iii) the repeated exposure to chlorpyrifos caused Laura's and Neal, Jr.'s alleged injuries, including Neal, Jr.'s malignant brain tumor. After the Neals designated their expert witnesses, including Dr. John Midtling, Rackley filed a motion to strike the expert report and any of Midtling's subsequent testimony. Dow joined in the motion. After a hearing, the trial judge orally granted the motion to strike Midtling's report and testimony regarding a causal connection between ependymoma and chlorpyrifos, but denied the motion with respect to Laura's alleged injuries.

Dow filed a no-evidence motion for summary judgment, alleging there was no evidence that Neal, Jr.'s brain tumor resulted from exposure to Dursban. In response, the Neals filed a motion to reconsider and vacate the prior ruling striking their witness's testimony. The trial judge later signed an order striking "Plaintiffs' experts' opinions that Dursban caused [Neal, Jr.] to suffer personal injury, including the development of [a brain tumor]." He then granted Dow's no-evidence summary judgment motion and severed all claims involving Neal, Jr.'s injuries into a separate cause number. After the Neals filed motions to nonsuit Intercity and Rackley, the trial judge signed orders dismissing the claims against both. This appeal followed.

### Expert Witness's Conclusion on Causation

In their sole issue on appeal, the Neals contend the trial judge abused his discretion in striking Midtling's testimony regarding causation. Under this issue, the Neals claim Midtling's testimony and expert report met the requirements of Texas Rule of Evidence 702, as well as those set forth in *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995) and *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997). After reviewing the record in this case, we cannot agree.

 We review a trial judge's decision to exclude an expert witness's testimony under an abuse of discretion standard. *Robinson*, 923 S.W.2d at 558; *Jarrell v. Park Cities Carpet & Upholstery Cleaning, Inc.*, 53 S.W.3d 901, 902 (Tex.App.-Dallas 2001, pet. filed). A trial judge abuses his discretion when his decision is arbitrary or unreasonable or he acts without reference to any guiding rules or principles. *Mercedes–Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex.1996); *Robinson*, 923 S.W.2d at 558. A trial judge does not abuse his discretion in excluding expert testimony when (i) the testimony was not based on a reliable foundation, (ii) no testing was conducted to exclude other possible causes, (iii) the expert's methodology was suspect, (iv) the expert's research was conducted for litigation, or (v) the expert's methodology had not been subjected to peer review or publication. *Jarrell*, 53 S.W.3d at 902 (citing *Robinson*, 923 S.W.2d at 558–59).

To admit expert testimony, rule 702 requires (i) the witness be qualified, (ii) the proposed testimony be "scientific ... knowledge," and (iii) the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Robinson,* 923 S.W.2d at 556.[2] To constitute scientific knowledge that will "assist the trier of fact," the proposed testimony must be both relevant and reliable. *Robinson,* 923 S.W.2d at 556. The trial judge's role is to make the initial determination of whether an expert's opinion is relevant and whether the methods and research upon which it is based are reliable. *Robinson,* 923 S.W.2d at 558. Relevant testimony is that which is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Robinson,* 923 S.W.2d at 556 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). "In addition to being relevant, the underlying scientific technique or principle must be reliable. Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.' " *Robinson,* 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *see Havner,* 953 S.W.2d at 711–14 (expert's bare opinion is not sufficient; trial judge must examine expert's methodology and underlying studies or data to determine whether opinion is reliable). Evidence that is either irrelevant or unreliable is inadmissible. *Robinson,* 923 S.W.2d at 557.

In toxic tort litigation, causation is often discussed in terms of general and specific causation:

General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury. In some cases, controlled scientific experiments can be carried out to determine if a substance is capable of causing a particular injury or condition, and there will be objective criteria by which it can be determined with reasonable certainty that a particular individual's injury was caused by exposure to a given substance. However, in many toxic tort cases, direct experimentation cannot be done, and there will be no reliable evidence of specific causation.

In the absence of direct, scientifically reliable proof of causation, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury. The finder of fact is asked to infer that because the risk is demonstrably greater in the general population due to exposure to the substance, the claimant's injury was more likely than not caused by that substance. Such a theory concedes that science cannot tell us what caused a particular plaintiff's injury. It is based on a policy determination that when the incidence of a disease or injury is sufficiently elevated due to exposure to a substance, someone who was exposed to that substance and exhibits the disease or injury can raise a fact question on causation.

*Havner,* 953 S.W.2d at 714–15.

Here, it is clear that direct, scientific experimentation to determine whether

---

**2.** Rule 702 provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
> Tex.R. Evid. 702.

exposure to chlorpyrifos causes ependymoma cannot be performed. Therefore, to establish general causation, Midtling relied upon articles and studies published in the medical literature. We first determine whether Midtling's conclusion that Dursban, or more specifically chlorpyrifos, is capable of causing ependymoma in the general population has a reliable basis.

In his expert report, Midtling opined that "the development of [Neal, Jr.'s] brain cancer ... was from his in utero exposure and/or from his postnatal exposure to chlorpyrifos." Rackley, joined by Dow, filed a motion to strike Midtling's testimony because it did not meet the requirements of rule 702, *Robinson,* and *Havner.* The Neals filed a response, attaching Midtling's affidavit. In his affidavit, Midtling testified he concluded Neal, Jr.'s "exposure to Dursban (chlorpyrifos) was more likely than not a cause or a contributing cause of the development of his ependymoma." Midtling based his conclusion, in part, on the "medical and scientific literature which was cited in the reference section of [his expert] report." Specifically, Midtling discussed four studies "report[ing] on exposure to pesticides and the risk of childhood brain cancer" which, according to Midtling, showed a significant association between the "extermination for insects" and the risk of brain cancer. The motion was set for a hearing.

During the hearing, Midtling stated his opinion that the effects of Laura's "acute and chronic exposure to chlorpyrifos would, in fact, be a likely cause or would more likely than not be a contributing factor to the development of [Neal, Jr.'s] brain tumor." He testified he rendered his opinion after reviewing the medical records, interviewing Laura, obtaining her history and a physical exam, "reviewing the medical literature regarding the effects of the organophosphate chlorpyrifos," consulting with other experts, and doing a differential diagnosis.[3]

Although Midtling identified various medical articles on which he based his conclusion that Neal, Jr.'s brain tumor was caused by his and Laura's exposures to chlorpyrifos, the articles Midtling relied upon do not conclude that chlorpyrifos "causes" ependymoma, nor do they conclude that such exposure will result in a statistically significant risk of developing ependymoma. One of the studies noted:

> Most epidemiological research done to date on pesticides and pediatric brain tumor risk has focused on nonspecific pesticide use, and findings from these studies have been inconclusive. Some investigators have noted increased risk of brain tumor among children generally exposed to pesticides but several studies, *including ours, have not supported this observation....* Several pesticide exposures during childhood were associated with increased risk, including general pesticides for nuisance pests, pest strips, termite treatment, lice treatment, garden and orchard insecticides (specifically carbaryl and diazinon), and herbicides. We found no risk increases for any of these exposures during childhood.... The only exposure we studied that produced a significantly increased risk of pediatric brain tumor was prenatal exposure to flea/tick products, especially among children diagnosed at younger ages (less than 5 years).

**3.** Differential diagnosis is a "patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes." *Minn. Mining & Mfg. Co. v.*

*Atterbury,* 978 S.W.2d 183, 194 n. 9 (Tex.App.-Texarkana 1998, pet. denied) (citing *Pick v. Am. Med. Sys., Inc.,* 958 F.Supp. 1151, 1162–63 (E.D.La.1997)).

Janice M. Pogoda and Susan Preston-Martin, *Household Pesticides and Risk of Pediatric Brain Tumors*, 105 ENV'T HEALTH PERSPECTIVES 1214, 1217–18 (Nov. 1997) ("POGODA STUDY") (emphasis added). The study noted the risk "appeared to be primarily confined to sprays/foggers" and that chlorpyrifos was "relatively common only in sprays." POGODA STUDY at 1218. However, it concluded only that "there appear[ed] to be enough evidence to warrant further investigation." POGODA STUDY at 1219.

According to Midtling, another study "reported that the risk factor 'extermination for insects' in the household prior to diagnosis of the index child was significantly associated with the risk of brain cancer." However, the study's own authors concluded:

> Regarding chemical carcinogenic exposures that the children may have had, the findings remain inconclusive. There was a marked tendency for more children with brain tumors to have had exposures to insecticides when compared to normal children [i.e., children without cancer or brain tumors], but no such differences were observed when the comparison was made to children with other cancers. The finding that exposure to insecticides is greater in both children with brain tumors and cancer controls than in normal children may be suggestive of selective recall on the part of parents of seriously ill children in an attempt to somehow explain their childrens' illnesses. However, it is also possible that insecticides may contain non-specific chemical carcinogens which may induce not only brain tumors in children but cancers in general. Further information regarding particular insecticide agents would be of interest in this regard.

Ellen Gold, Leon Gordis, James Tonascia, and Moyses Szklo, *Risk Factors for Brain Tumors in Children*, 109 AM. J. OF EPIDEMIOLOGY 309, 317 (1979) ("GOLD STUDY"). The study concluded by stating that "several intriguing observations [had] been made with regard to possible etiologic facts associated with brain tumors in children." GOLD STUDY at 318.

Neither of these studies nor their "conclusions" show a statistically significant association, much less evidence of general causation sufficient to meet the *Robinson* and *Havner* requirements. Similarly, the other studies Midtling cited do not establish any statistically significant association between the exposure to chlorpyrifos and ependymoma. Because Midtling's opinion that Neal, Jr.'s ependymoma was more likely than not caused by his exposure to chlorpyrifos is not supported by reliable evidence of general causation, we cannot conclude the trial judge abused his discretion in excluding Midtling's testimony. We overrule the Neals' sole issue.

We affirm the trial court's judgment.