**Lisa PLUNKETT, et al., Appellants,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE CO., et al., Appellees.**

**No. 05–07–00614–CV.**

Court of Appeals of Texas, Dallas.

Feb. 27, 2009.

Rehearing Overruled June 30, 2009.

property losses and personal injuries arising from toxic mold contamination. Appellees moved for summary judgment for lack of evidence of damage and causation, or alternatively because the evidence negated proof of those elements, which the trial court granted. In two issues, residents argue that they provided sufficient evidence raising genuine material fact issues regarding (i) causation on their claims for property damage and (ii) causation on their personal injury claims. In a cross-issue, appellees argue the trial court's property damage summary judgment encompassed the residents' separate conversion claims. We affirm the trial court's summary judgments on all residents' property damage and personal injury claims and remand for further proceedings consistent with this opinion.

Francis I. Spagnoletti, David A. Bickham, James T. Liston, Spagnoletti & Company, Houston, TX, for Appellant.

Terry Fitzgerald, The Fitzgerald Law Firm, The Woodlands, Earl B. Austin, Samara L. Kline, Baker Botts, L.L.P., D. Randall Montgomery, John C. Sherwood, Law Offices of John C. Sherwood, Dallas, TX, Christopher J. Pruuitt, Brown Pruitt Peterson & Wambsganns, Fort Worth, TX, Carlos A. Peniche, Kroger, Myers, Frisby & Hirsch, Houston, Steven M. Burton, Waco, TX, for Appellees.

Before Justices MOSELEY, BRIDGES, and LANG–MEIRS.

## OPINION

Opinion by Justice BRIDGES.

Multiple residents of an apartment complex sued various defendants alleging

### BACKGROUND

Residents are former residents of Saratoga Springs, a multi-unit apartment complex in Dallas, Texas. Residents sued multiple appellees including the complex's owner and entities involved in its development, design, construction, maintenance, and management. They alleged either personal property losses or personal injuries or both, arising from toxic mold contamination. The complex was ultimately closed in April, 2001, about seven months after mold was discovered, according to the residents. Some residents allege conversion of their personal property left at the complex when they vacated the premises.

On appellees' motions, the trial court in two separate orders granted take-nothing summary judgments on the property damage claims of all residents and the personal injury claims of 62 residents, leaving personal injury claims of 14 remaining resi-

dents pending.[1] The latter 14 claims are not before us. This appeal followed severance of the claims disposed of by summary judgment, which made the summary judgments final and appealable.

The parties do not dispute the presence of mold contamination at the complex. At issue is evidence, to defeat summary judgment, of the existence of contamination of and damage to residents' personal property, and whether any property damage and the health complaints were caused by exposure to the mold at the complex. The parties also dispute whether the trial court's summary judgment properly encompassed residents' conversion claims and thereby disposed of them.

## STANDARD OF REVIEW

Appellees sought both "traditional" and "no evidence" summary judgments. *See* TEX.R. CIV. P. 166a(c), (i). We review summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). Our de novo standard of review extends to both "traditional" and "no evidence" summary judgments. *Shaun T. Mian Corp. v. Hewlett–Packard Co.*, 237 S.W.3d 851, 855 (Tex.App.-Dallas 2007, no pet.).

The standard of review governing "traditional" summary judgments is well known. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). The summary judgment movant bears the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex.2000) (per curiam). To meet its burden, the summary judgment movant must either disprove at least one essential element of a claim as a matter of law or conclusively establish all elements of an affirmative defense to the claim. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex.1996) (per curiam).

Once the movant produces sufficient evidence establishing its right to summary judgment, the nonmovant must produce controverting evidence raising a fact issue on the elements or claims negated. *Tate v. Goins, Underkofler, Crawford & Langdon*, 24 S.W.3d 627, 632 (Tex.App.-Dallas 2000, pet. denied) citing *Torres v. Western Cas. & Sur. Co.*, 457 S.W.2d 50, 52 (Tex. 1970); *see also City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979). We take as true all evidence favoring the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661.

A "no evidence" summary judgment is properly granted if, after adequate time for discovery, the movant asserts there is no evidence supporting one or more specified elements of a claim or defense on which the nonmovant bears the burden of proof at trial, and the nonmovant then produces no summary judgment evidence raising a genuine issue of material fact on those elements. TEX.R. CIV. P. 166a(i); *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex.2006) (per curiam). Because a "no evidence" summary judgment is essentially a pretrial directed verdict, we apply the same legal sufficiency standard of review governing the latter. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003).

1. There are minor inconsistencies in the briefing on the total number of property damage and personal injury claimants. However, the summary judgment orders specifically name 112 residents with property damage claims and the 62 residents with personal injury claims disposed of.

We sustain "no evidence" or legal sufficiency challenges where (1) there is a complete absence of evidence of a vital fact (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact (3) the evidence offered to prove a vital fact is no more than a scintilla or (4) the evidence conclusively establishes the opposite of the vital fact. *Chapman*, 118 S.W.3d at 751. Less than a scintilla of evidence exists when the evidence is so weak it does no more than create a surmise or suspicion of a fact. *Id.* Evidence so slight making an inference therefrom a guess is in legal effect no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). More than a scintilla of evidence exists when it is sufficient to enable reasonable and fair-minded people to differ in their conclusions. *Chapman*, 118 S.W.3d at 751. And a matter may be conclusively established by the evidence "only if reasonable people could not differ in their conclusions, which depends on the facts of each case." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex.2005).

In reviewing "no evidence" summary judgments, we review both the movant and nonmovant's evidence in the light most favorable to the party against whom summary judgment was rendered. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006). We indulge every reasonable inference and resolve any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292, (Tex.2006) (per curiam) (citing *City of Keller*, 168 S.W.3d at 823). We credit evidence favorable to the party against whom summary judgment was rendered if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Mack Trucks*, 206 S.W.3d at 582 (citing *City of Keller*, 168 S.W.3d at 827).

When a successful summary judgment movant presents both "traditional" and "no evidence" grounds, we must affirm it if it can be sustained under either standard. *Bradford Partners II, L.P. v. Fahning*, 231 S.W.3d 513, 517 (Tex.App.-Dallas 2007, no pet.). We first review the propriety of the "no evidence" summary judgment under Rule 166a(i), applying evidentiary legal sufficiency standards. *Ridgway*, 135 S.W.3d at 600. If those are not satisfied, we need not inquire further into whether the "traditional" summary judgment standards under Rule 166a(c) are met. *Id.*

■ The trial court did not specify the grounds for either summary judgment other than to state whether each encompassed "property damage" or "personal injury" claims. When the trial court does not specify the basis for its summary judgment, we must affirm it on any meritorious ground raised in the motion. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex.2000). The same rules apply to summary judgments that do not specify whether they are granted on "traditional" or "no evidence" grounds. *Fidelity & Deposit Ins. v. Swan Roofing, L.L.C.*, 167 S.W.3d 633, 635 (Tex.App.-Dallas 2005, no pet.). Our discussion below leads us to conclude residents have not sufficiently raised a genuine issue of material fact on at least one essential element of their property damage and personal injury claims to defeat summary judgment under traditional summary judgment evidentiary standards.

### Standards Governing Expert Testimony

■ Residents argue this is a simple summary judgment proceeding that does not involve a specific or separate challenge to the reliability of their experts' damage and causation opinions under *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995) and its progeny.

They apparently conclude that the exacting standards otherwise governing the court's scrutiny of expert opinions do not apply, arguing their evidentiary burden is "relatively low" and that "scientific inquiries" into whether toxic mold exposure causes damage to household goods were not before the trial court and are "not at issue on appeal." They essentially contend we must take expert opinions at face value on summary judgment. We do not find these arguments persuasive.

The supreme court explicitly held in *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 712–14 (Tex.1997) that unreliable scientific expert testimony is legally no evidence. *Havner* held that *Robinson*-type standards[2] are applicable to assess reliability in a "no evidence" or legal sufficiency review of the testimony. *Id.*[3] That reliability review encompasses assessing flaws in both methodology and underlying data. *Id.* at 714. *Havner* notes, at 712:

> It could be argued that looking beyond the testimony to determine the reliability of scientific evidence is incompatible with our no evidence standard of review. If a reviewing court is to consider the evidence in the light most favorable to the verdict, the argument runs, a court should not look beyond the expert's tes-

timony to determine if it is reliable. But such an argument is too simplistic. It reduces the no evidence standard of review to a meaningless exercise of looking to see only what words appear in the transcript of the testimony, not whether there is in fact some evidence. We have rejected such an approach. [citations omitted.]

These summary judgment proceedings squarely addressed the sufficiency of residents' expert testimony to raise fact issues on damages and causation, which appellees specifically attack as unreliable, speculative, and conclusory. We find no authority to support an argument that normal expert reliability standards do not apply in a summary judgment proceeding, which we review de novo. *Dorsett*, 164 S.W.3d at 661.

We also must apply an evidentiary legal sufficiency standard of review to the "no evidence" summary judgments, *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex.2003), which the supreme court in *Havner* informs us incorporates *Robinson*-type scrutiny of expert opinion reliability. As the trial court did not specify the grounds for summary judgment, we conclude residents in this summary judgment appeal must show the testimony of their experts met those reliability stan-

---

**2.** *See Robinson*, 923 S.W.2d at 557 (factors include (1) extent to which the theory has been or can be tested; (2) extent to which the technique relies on an expert's subjective interpretation; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential error rate; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique). While *Robinson* involved assessing reliability of "scientific" expertise, the supreme court later emphasized those factors are non-exclusive, and held the reliability inquiry extends to *all* expert testimony; e.g., based on "technical or other spe-

cialized knowledge" or an individual's skill, experience, and training. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720, 722, 724, 725–26 (Tex.1998).

**3.** *Robinson* involved only admissibility of evidence, not legal sufficiency, but after *Havner*, both reviews are now governed by the same reliability test, so distinguishing between them has "little practical effect." *Austin v. Kerr–McGee Ref. Corp.*, 25 S.W.3d 280, 284 (Tex.App.-Texarkana 2000, no pet.); *accord, Mobil Oil Corp. v. Bailey*, 187 S.W.3d 265, 267–68, n. 3 (Tex.App.-Beaumont 2006, pet. denied).

dards. *See FM Props.*, 22 S.W.3d at 872–73.

### DISCUSSION

### Property Damage Claimants

The property damage claimants seek to recover the cost of replacement or alternatively remediation of personal property allegedly contaminated by toxic mold. Appellees sought and obtained summary judgment on all claims and seek its affirmance on grounds of insufficient evidence of either actual damage or causation to raise a fact issue. Specifically, appellees sought traditional summary judgment on claims of about two dozen residents on grounds that they admitted in their deposition testimony they could not substantiate their claims. Appellees sought summary judgment on claims of all residents on grounds that they failed to meet their burden on summary judgment to provide any competent evidence of actual damage or causation to avoid dismissal of their claims.[4]

Residents rely in part on personal inventories and professional appraisals (I & As) of property claimed to be damaged, and also refer to deposition transcripts of 21 residents in the record. Appellees do not challenge the sufficiency of residents' evidence to show what property the residents possessed and its original value.

■■■ On contamination damage and causation, residents re-argue that this case does not involve a specific expert-opinion challenge, and conclude that lay testimony is sufficient to defeat summary judgment.

They also rely on the familiar standard in a "traditional" summary judgment review requiring us to take as true all evidence in their favor. This argument assumes expert testimony is not required on property damage and causation issues in mold exposure cases. We need not reach that issue, however, because residents do not set out the substance and location in the record of any specific lay testimony on actual contamination or causation on which they rely, nor do they explain the relevance of any such evidence. It is not this Court's duty to independently search the record for evidence supporting a party's position. *Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d 301, 313 (Tex.App.-Dallas 2006, no pet.).

■■■ Instead, residents specifically relied on designated expert opinion to challenge summary judgment, to which we now turn. For evidence of contamination and its cause, residents rely on an affidavit and reports submitted by their designated toxicology expert Ronald H. Tisdell, principal of Toxicology Litigation Consultants, Inc., in conjunction with sample ambient indoor air quality tests (IAQTs) conducted by Tisdell and Envirotest, a firm hired by appellees.

The record shows the apartment complex comprises 241 units in 31 buildings, and residents claim damage to a very large number of many disparate property item types. It is undisputed that only three property items from just one apartment (Burnett items and Burnett unit, respectively)[5] were ever tested. Testing of the Burnett items occurred years after the

---

4. There are minor inconsistencies in the briefing on the number of deposed residents and the total number of property damage claimants, and appellees' trial court summary judgment motion in a footnote indicates two residents non-suited before being deposed. However, the trial court's summary judgment order names 112 total property damage residents, including the two stated to have non-suited, Tracy Deanda and Lori Jones.

5. Lara Burnett's unit #2501. The tested items were a decorative pillow, fan blades, and wood furniture.

apartment complex had closed and the IAQTs had been performed. Thus, no property item was tested concurrently with performing the IAQTs, or while any resident was still in residency. Finally, the IAQTs were performed between March and November, 2001, encompassing a seven-month period after the complex had closed in April, 2001 and all residents had vacated.

In lieu of data from direct, onsite property item testing during or near the time of residents' occupancy, Tisdell relied on testing of the Burnett items. His affidavit states that the test showed Burnett's furniture was contaminated with toxin-producing *stachybotrys* mold. However, he noted *stachybotrys* was *not* detected by the Burnett unit IAQT.

The record shows the testing of the Burnett items was contracted out to a Tisdell company called Mycotech Biological, Inc., outside of Dallas. The test analysis reflects the test samples were not taken until April, 2003, and not analyzed until nearly a year later, in March, 2004—about two and three years, respectively, after the last residents had vacated due to the complex's closure in April, 2001, and about a year and a half and two and a half years, respectively, after the IAQTs were completed. Residents did not attempt to lay a foundation for Tisdell's opinion with summary judgment evidence on chain-of-custody; e.g., establishing where and under what conditions the items and samples were stored and who had possession and control of them in the intervening period. Tisdell also did not attempt to rule out potential alternate causes or sources of contamination of the Burnett items during that intervening period.

As stated, Tisdell tested no property item concurrently with its presence in *any* apartment shown by an IAQT to contain airborne mold, and tested no property items but the Burnett items. His contamination and causation opinions on *all* property from *all* units was an extrapolation from (i) the IAQTs and (ii) the later test of the three Burnett items. Specifically, Tisdell concluded the IAQTs showed sufficient airborne toxic mold levels in all units warranting remediation or replacement of all household objects of all of the residents by virtue of the items' presence in the units. To explain the discrepancy in the positive *stachybotrys* mold test on the Burnett items despite the earlier, negative Burnett unit IAQT, Tisdell faulted the IAQT methodology as producing inaccurate results.

Appellees challenge Tisdell's opinion as conclusory, speculative extrapolation unsupported by direct testing of the many disparate property items claimed contaminated, other than the three Burnett items. They also challenge his methodology as unreliable. They cite the discrepancy in mold type found in testing the Burnett items compared to the Burnett unit IAQT, and argue there is no evidence linking the Burnett items' mold back to the Burnett unit. They note the lack of chain-of-custody information on the Burnett items for the extended intervening period before they were tested, and note that even the IAQTs were performed well after the complex had closed and all residents had vacated. Appellees also cite certain IAQTs they contend show, despite positive tests for airborne mold, *no* contamination on some interior surfaces in about 80% of the units tested, and no contamination on *all* interior surfaces in about 20% of the units tested. Residents do not challenge appellees' recitation of these test results.

 If an expert's scientific testimony is not reliable, it is not evidence. *Havner*, 953 S.W.2d at 713. The party offering or relying on expert testimony bears the burden of showing the expert's opinion

is reliable. *Robinson,* 923 S.W.2d at 557. In a legal sufficiency review to determine whether expert testimony provides some evidence of an issue, the expert's "bare opinion will not suffice;" its substance must be considered and the data underlying it must be independently evaluated. *Havner,* 953 S.W.2d at 711, 713; *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 808 (Tex.2002). Inferences and opinions drawn either from unreliable foundational data or flawed methodology and reasoning are unreliable and legally no evidence. *Havner,* 953 S.W.2d at 714. To assess reliability, courts " 'should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.' " *Mack Trucks,* 206 S.W.3d at 579.

"An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999). An expert's conclusory statements are insufficient to raise a fact question to defeat summary judgment. *IHS Cedars Treatment Ctr. v. Mason,* 143 S.W.3d 794, 803 (Tex.2004). "Expert opinions must be supported by facts in evidence, not conjecture." *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam). In negligence suits generally, legally competent proof of causation may not be based on "speculation or conjecture." *See, e.g., Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996) (no evidence review of verdict in employee's suit alleging back injury caused by employer's breach of duty to provide proper lifting equipment). Expert opinions may be deemed unreliable where " 'there is simply too great an analytical gap between the data and the opinion proffered.' " *Gam-*

*mill,* 972 S.W.2d at 726. An expert must support an opinion or "close the 'analytical gap' " by showing "the connection between the data relied on and the opinion offered." *See Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 906 (Tex.2004).

Cases applying the "analytical gap" reliability standard are instructive. For example, the court in *Volkswagen of America, Inc. v. Ramirez,* 159 S.W.3d 897 (Tex. 2004) rendered judgment, for lack of legally sufficient expert evidence on causation, against residents who sued a vehicle manufacturer alleging a defective wheel assembly caused a fatal automobile accident. *Id.* at 901–02. Liability turned on whether the wheel assembly's behavior during the accident was a cause of the accident or the result of it. *Id.* at 902, 905–06. The court held that merely relying on general scientific or engineering principles or methods, even if generally accepted and utilized, was insufficiently reliable in the absence of actual test data supporting the specific causation theory of the case. *Id.* at 905–06. The court concluded that because the expert could "not close the 'analytical gap' by explaining how" the particular wheel assembly *actually* behaved in the accident, the opinion was simply his "subjective interpretation of the facts," and as such, unreliable and no evidence. *Id.* at 906. *Cf. Gammill,* 972 S.W.2d at 728 (emphasis in original) (holding as mere "subjective belief or unsupported speculation" opinion of expert who "offered nothing to suggest that what he believes *could have* happened actually *did* happen.").

Tisdell's opinion is similar to the theoretical opinions in *Ramirez.* As in that case, he did not "close the analytical gap" between conclusions and foundational data. He theorized, based on generalized toxicological expertise about the "very nature" of mold, that all residents' property items *must* have been contaminated due to their

presence in apartments containing the airborne mold shown by the IAQTs. But his affidavit revealed that the only property-item test offered to confirm the theory's validity did not support it; the affidavit states the Burnett unit IAQT did not test positive for the *stachybotrys* mold he found on Burnett's furniture. And as noted, appellees cite other IAQTs that failed to empirically link airborne and interior surface contamination.

While Tisdell faulted the IAQTs as providing unreliable data, that does not alter the fact that he offered no actual test data from *any* source specifically supporting his theory. Analytical gaps exist in the data he does rely on. The Burnett items were not tested concurrently with the Burnett IAQT, but years later. There is no information on where and under what conditions the items were stored in the years before they were tested to rule out potential alternate contamination sources. There similarly is no information on why IAQTs conducted over a seven-month period after the complex had closed and all residents had vacated reliably reflected actual contamination causing the damage alleged when the residents lived there and the property items were present.

In sum, Tisdell provides no empirical evidence or methodology that explains the validity of his extrapolation that "observations pertaining to the exposure of Ms. Laura Burnett's property are also applicable to all the other Residents' property." [6] Expert opinion "is not so simply because 'an expert says it is so[.]'" *Gammill*, 972 S.W.2d at 726 quoting *Havner*, 953 S.W.2d at 712. We conclude Tisdell's opinion is no evidence of property damage or causation, and fails to raise a fact issue to defeat summary judgment.[7]

### Personal Injury Claimants

The personal injury claimants allege health problems caused by exposure to toxic mold. Appellees sought and obtained summary judgment on the claims of 62 residents and seek its affirmance on grounds of insufficient expert evidence on causation to raise a fact issue. Specifically, appellees sought traditional summary judgment citing testimony from residents' two designated physician experts in their depositions that they (i) did not personally examine any resident and (ii) admitted this prevented them from opining on causation. Appellees also sought summary judgment

---

**6.** *Cf. Mack Trucks*, 206 S.W.3d at 580–81 (upholding exclusion of expert testimony as unreliable and summary judgment for no evidence of cause-in-fact in vehicle design-defect suit where expert, *inter alia*, failed to set out a process to exclude alternate causes of fire, did not explain or provide facts or analytical data supporting his conclusions, and did not testify to a methodology by which he reached them).

**7.** In light of our conclusion here that there is no competent evidence establishing liability, we need not reach residents' argument that the summary judgment was erroneous for failing to consider residents' "alternative theories of recovery" of damages for diminution in property values and remediation costs. These are merely damage measures, which are immaterial absent evidence raising a fact issue as to liability. *See Huddleston v. Pace*,

790 S.W.2d 47, 52 (Tex.App.-San Antonio 1990, pet. denied) ("A prerequisite to recovery of damages is the establishment of liability. In the absence of a finding of liability, the question of damages becomes immaterial."). We also note residents point to no evidence they provided on the costs or even feasibility of remediation. Residents' damages expert Tisdell opined in his pre-trial report that remediation was *not* economically feasible for most contaminated items, and then concluded in his affidavit that the only viable alternative was to replace all of them. Residents also point to no evidence on the extent of property value diminution claimed. The only measure-of-damage evidence on which residents relied was property-value appraisal evidence, which is relevant to replacement cost.

on grounds that residents failed to meet their burden on summary judgment to provide any competent expert testimony on causation to avoid dismissal of their claims.

Residents rely on an affidavit of Dallas allergist/immunologist Dr. Seshagiri Rao and two charts attached to the affidavit purportedly summarizing claimant exposure and health-complaint information. Dr. Rao stated his staff prepared the first chart and Arizona internist/toxicologist Dr. Michael R. Gray prepared the second. However, because the 13 residents listed on Dr. Rao's chart are not among the group of the 62 residents subject to the trial court's summary judgment, we limit our consideration to the chart prepared by Dr. Gray. Appellees, by contrast, relied on deposition testimony of Drs. Gray and Rao.[8]

Dr. Gray testified in great detail on a comprehensive battery of diagnostic tests he routinely orders and analyzes on patients claiming exposure to mold. He then testified he did *not* conduct any of those diagnostic procedures on any resident when asked about each resident one-by-one. He admitted he had not personally seen any of them. He testified that because he did not conduct any diagnostic procedures, he could not diagnose any resident's health condition. He admitted he "would need to examine the patient" personally to make a clinical diagnosis, and could do no more than make a preliminary assessment and draw a preliminary conclusion from reviewing paper histories without a comprehensive medical exam.

Dr. Gray could ultimately opine only that there was "a possibility" of a causal connection between the contaminant exposure alleged and the residents' claimed symptoms, and conceded he had "drawn no further conclusions" because he had not "evaluated the patients." He concluded that as a medical doctor he was unwilling to opine with a reasonable degree of medical probability that there was a causal link between any contaminant exposure alleged and the residents' claimed symptoms without conducting his diagnostic procedures and performing a medical exam.

Competent expert medical causation evidence, whether expressed in testimony or in medical records, must be grounded in reasonable medical probability, not speculation or conjecture. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex.1995). This inquiry turns on the substance and context of the expert's opinion rather than use of any particular words. *Id.* Mere possibility rather than reasonable probability of causation is no evidence. *Schaefer v. Tex. Employers' Ins. Ass'n*, 612 S.W.2d 199, 204–05 (Tex. 1980). Both the substance and literal statements of Dr. Gray's deposition leads us to conclude his opinion is no evidence of either a medical diagnosis or causation.

Residents principally rely on Dr. Rao. In his pre-trial expert report he opined that toxigenic mold exposure caused the health complaints of the residents he lists on the report. The report states his opinion is based on document

8. Appellees argue 47 of the 62 residents subject to the summary judgment did not designate Dr. Rao as an expert or provide a report from him on their claims, leaving only 15 residents who may permissibly rely on Dr. Rao. However, the record reflects a collective designation by residents of multiple experts, including both Drs. Gray and Rao. Appellees do not dispute a proper pre-trial designation and report of Dr. Gray as to the 47 residents, and concede all 62 residents are listed on Dr. Rao's summary judgment affidavit. However, we need not decide these issues; as discussed below, Dr. Rao's affidavit is still no evidence on causation as to all residents.

review, medical literature, and his expertise—not in-person exams. He affirmed in his deposition he had not examined any of them.

Dr. Rao also testified in his deposition that he reviewed no medical records on the residents named in his report, and stated the only data he had were the IAQTs and some blood test results. He testified he knew "nothing" about these residents' medical history. He testified he was never asked to assess their medical condition at the time they were living at the apartment complex. And he testified he did not know whether they had any medical conditions causing their health complaints unrelated to living at the complex.

There is no evidence that Dr. Rao personally examined *any* resident subject to the trial court's summary judgment. He agreed in his deposition that he only had opinions about people he had examined and did not have a firm medical opinion to a reasonable degree of medical probability about people he had never seen. As to people he had not seen, he testified he was unable to opine with a reasonable degree of medical probability that their health complaints were in fact caused by mold exposure at the complex, as opposed to something else. Thus, Dr. Rao's own deposition testimony establishes his opinion on either medical diagnosis or causation is no evidence.[9]

In lieu of Dr. Rao's pre-trial report and deposition, residents rely on an affidavit given by Dr. Rao four months after his deposition, and filed with residents' summary judgment response. Like his pre-trial report, the affidavit was not based on personal examinations. He nonetheless opined that, with reasonable medical probability, a major cause of the residents' health complaints was airborne toxigenic mold exposure at the apartment complex.

Residents rely on a statement in Dr. Rao's affidavit, which appears to contradict his earlier deposition, that he did *not* feel a personal physical exam was necessary to opine on causation. But his reasoning is unrelated to whether it is medically necessary to personally examine a patient to ascertain causation; i.e., he reasoned (i) residents had their own doctors and (ii) any symptoms would likely abate before he could see them such that exams would be unrevealing.

A person cannot file an affidavit to contradict his own deposition testimony without any explanation for the change for the purpose of creating a fact issue to avoid summary judgment; such an affidavit presents no more than a "sham" fact issue. *Eslon Thermoplastics v. Dynamic Systems, Inc.*, 49 S.W.3d 891, 901 (Tex. App.-Austin 2001, no pet.). A court reviewing a summary judgment may disregard such an affidavit as summary judgment evidence under this rule. *See Burkett v. Welborn*, 42 S.W.3d 282, 286 (Tex.App.-Texarkana 2001, no pet.).[10]

---

9. Residents argue Dr. Rao's opinion is sufficient to defeat summary judgment because he testified he reviewed blood test results on the residents listed on his pre-trial report. But this is still no evidence because he was specifically examined in his deposition on the substance of that report and in spite of the blood tests, he admitted he could not medically opine as to the listed residents because he had not personally examined them.

10. While appellees did not move to strike the affidavit, in a reply supporting their summary judgment motion they raised this "sham affidavit" defense to its evidentiary sufficiency to defeat summary judgment. As the trial court did not specify the grounds for summary judgment, we will consider it as a ground supporting its affirmance. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989) ("When a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling,

But even if we consider the substance of Dr. Rao's affidavit, it is still insufficient to raise a fact issue.

Dr. Rao's affidavit relied on Dr. Gray's chart purporting to summarize contaminant exposure and health complaints as to each resident. As shown above, Dr. Gray admitted he could not competently opine on either a medical diagnosis or causation as to any resident because he examined none of them. Residents do not dispute this testimony. Thus, to the extent Dr. Rao's opinion relies on Dr. Gray's chart, it is no evidence as well. *See Havner,* 953 S.W.2d at 714 (opinions drawn from unreliable data or methodology are likewise unreliable and no evidence).

Dr. Rao's opinion in his affidavit was also based on certain factual assumptions he was asked to make. He was asked to assume that "pervasive and uncontrolled" mold was present when residents lived at the apartment complex; that all experienced respiratory or mucosal irritation at the time, which abated when they left; and that leaving was the "only significant change" to their environment. While Dr. Rao relied on the airborne toxigenic mold levels shown by the IAQTs as evidence of exposure, and there does not appear to be a dispute about the residents' apartment occupancy dates, residents do not detail the source and substance of the evidence supporting all the assumptions. Because the only medical evidence on which Dr. Rao relied was Dr. Gray's chart, which we concluded above is no evidence of either a medical diagnosis or causation, Dr. Rao's opinion based on assuming unproven clinical facts can be no evidence and just begs the causation question.

"Expert opinions must be supported by facts in evidence, not conjecture." *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam). In deciding summary judgment motions, trial courts should not consider expert opinion based on assumptions of unproven facts. *Rayon v. Energy Specialties, Inc.,* 121 S.W.3d 7, 20 (Tex.App.-Fort Worth 2002, no pet.). Moreover, conclusory expert opinions are insufficient to defeat summary judgment. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997). "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Brown v. Brown,* 145 S.W.3d 745, 751 (Tex.App.-Dallas 2004, pet. denied).

In lieu of relying on personal exams, Dr. Rao's affidavit describes what he states medical science recognizes as the health effects of mold exposure on people generally; states he reviewed the list of the residents' health complaints; opined that the IAQTs revealed airborne contaminant levels "sufficient for the causation of health problems"; and then concluded all health complaints of all residents were caused by exposure to the airborne mold found at the apartment complex.

But toxic tort cases require proof of both "general" and "specific" causation. *Havner,* 953 S.W.2d at 714; *accord, Mobil Oil Corp. v. Bailey,* 187 S.W.3d 265, 270 (Tex.App.-Beaumont 2006, pet. denied); *Frias v. Atlantic Richfield Co.,* 104 S.W.3d 925, 928 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see generally Coastal Tankships, U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 601–02, n. 19 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). General causation addresses whether a substance is "ca-

summary judgment will be affirmed on appeal if any of the theories advanced are meritorious."); *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993) (Tex.R. Civ. P.

166a(c) restricts trial court's summary judgment ruling to "issues raised in the motion, response, and any subsequent replies.").

pable of causing a particular injury or condition in the general population," while specific causation addresses whether a substance "caused a particular individual's injury." *Havner*, 953 S.W.2d at 714; *Neal v. Dow Agrosciences L.L.C.*, 74 S.W.3d 468, 472 (Tex.App.-Dallas 2002, no pet.). *See also Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 244 (Tex.App.-Houston [14th Dist.] 2002, no pet.) ("With regard to whether a plaintiff's injury was caused by exposure to a particular substance, a resident generally must prove both that the substance is capable of causing a particular injury or condition and that the substance in fact caused the plaintiff's injury.") (citing *Havner*, 953 S.W.2d at 715–16).

Dr. Rao admitted he examined none of the individual residents and did not believe it medically necessary to do so. His affidavit does no more than provide evidence that the type of mold found at the apartment complex is generally capable of causing health problems, but is no evidence of cause-in-fact of any specific resident's health complaints, and is conclusory.

We conclude the opinion testimony of both Drs. Gray and Rao is no evidence of causation, under applicable summary judgment evidentiary standards. Residents' proffered expert opinions thus do not raise a fact issue to defeat summary judgment.

### Conversion Claimants

Residents generally alleged appellees are liable for conversion of some property items left behind at the apartment complex when vacating the premises. The petition did not identify which residents claimed conversion or what items they claim had been converted, and there is no evidence of declarations or disclosures filed by any resident detailing these claims.

Appellees in a cross-issue argue the trial court's summary judgment order on residents' property damage claims properly disposed of the conversion claims as well. Residents counter that if the summary judgment order on all "property damage" claims encompassed the conversion claims, it is error because appellees did not specifically move for summary judgment on them.

Appellees make two arguments to support their cross-issue. First, they argue residents were barred from asserting any conversion claims at all because they did not file specific disclosures identifying each claim as to each resident, as ordered by the trial court.[11] Appellees alternatively argue that even assuming valid pending conversion claims, those claims were just a "subset" of or re-labeled "property damage" claims, and thus were subsumed in and disposed of by the trial court's "property damage" summary judgment order.

The trial court did not state the specific grounds for granting either summary judgment, other than stating whether each encompassed "property damage" or "personal injury" claims. Residents requested the trial court to clarify the intended scope of the summary judgment order's terms, which it denied. The property damage summary judgment order *does* specify that "[a]t issue in this motion are residents' claims for property damage i.e., damage to . . . personal belongings . . . in their apartments," and the order states it granted summary judgment on all claims for "property damage—that is, . . . for damages allegedly caused to residents' personal

11. Appellees also argue there were never any filed conversion claims pending before the trial court when the summary judgment was granted. While this argument appears inconsistent with appellees' argument that the summary judgment disposed of the conversion claims, the record in fact shows an Eighth Amended Petition generally alleging conversion filed 19 days before summary judgment was granted.

property as a result of alleged exposure to mold...."

 As stated, appellees posit the conversion claims are merely a "subset" or re-labeling of claims for property "damage" caused by mold exposure, concluding the summary judgment order's terms properly disposed of both. Residents' position is that summary judgment on the conversion claims is inappropriate because appellees did not specifically move for it. We reject appellees' position and agree with residents'.

"There is a material difference between 'property taken' and 'property damaged'." *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 493 (Tex.Civ.App.-Dallas 1970, no writ) (listing cases). A summary judgment motion on "property damage" claims is substantively different from one specifying conversion as its subject.

 A motion for summary judgment "shall state the specific grounds therefor." TEX.R. CIV. P. 166a(c); *see generally McConnell v. Southside Indep. School Dist.*, 858 S.W.2d 337, 341 (Tex.1993) (motion "must itself expressly present the grounds upon which it is made" and "stand or fall" on those grounds). Trial courts may not grant a summary judgment on grounds not presented, *Johnson v. Brewer & Pritchard*, P.C., 73 S.W.3d 193, 204 (Tex.2002), and we may not affirm a summary judgment on grounds "not expressly set out in the motion or response." *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993). Under these rules, if a summary judgment grants more relief than requested, it should be reversed and remanded. *Crooks v. Moses* 138 S.W.3d 629, 640–41 (Tex.App.-Dallas 2004, no pet.). We conclude the property damage summary judgment did not dispose of the conversion claims and we may not affirm it on the basis that it did.

Based on review of appellees' property damage summary judgment motion and the terms of the trial court's summary judgment order, we conclude that the order did not grant summary judgment on the residents' conversion claims. Thus, we hold the property damage summary judgment did not encompass and dispose of them. Because the trial court severed out the claims disposed of by summary judgment before this appeal was taken, we also conclude the conversion claims are not before us and remained pending for consideration in the trial court when this appeal was filed.

CONCLUSION

In light of our analysis, we affirm the trial court's summary judgments on all residents' property damage and personal injury claims and remand for further proceedings consistent with this opinion.