COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | | |
|---|---|---|---|
| M&A TECHNOLOGY, INC., | § | | |
| | | No. 08-08-00022-CV | |
| Appellant, | § | | |
| | | Appeal from the | |
| v. | § | | |
| | | 44th District Court | |
| IVALUE GROUP, INC., A/K/A | § | | |
| EXPLORE, INC. AND JULIAN ROSS, | | of Dallas County, Texas | |
| | § | | |
| Appellees. | | (TC#02-09794-B) | |
| | § | | |

## O P I N I O N

This is an appeal from the 44th District Court of Dallas County, Texas. iValue Group, Inc., a/k/a Explore, Inc. (IVG) sued M&A Technology, Inc. (M&A) for conversion, promissory estoppel, and breach of contract. M&A filed a separate suit against Julian Ross, founder of iValue and employee of M&A, for conversion and theft and simultaneously sought leave to file a counterclaim and third-party claim in the IVG suit with similar allegations.

Leave was eventually granted and a summary judgment was granted in favor of Ross on M&A's claims on the grounds of lack of due diligence in serving Ross. The remaining claims went to the jury, which found that M&A had converted IVG's property, committed theft, and breached its agreement with IVG and awarded $3 million in actual damages and $6 million in exemplary damages. The jury rejected M&A's counterclaims. The final judgment was entered in the amount of $10,216,307, plus post-judgment interest. After reviewing the evidence presented in this case we agree that the damages were speculative and thus do not support the jury's award. The other evidence, while legally sufficient to support the jury's award, is not factually sufficient. We also

agree that the trial court erred in granting a summary judgment in favor of Ross. Therefore, we reverse the ruling of the trial court and remand this case for a new trial.

## I. FACTS

In 1999 iValue Group, Inc. (IVG) was formed under the name nuGift.com Corporation. Shortly after its founding nuGift.com changed its name to iValue Group, Inc. The goal of the company was to bring buyers and sellers together in an on-line market, without the requirement of an inventory.

IVG's initial startup capital was $800,000. The $800,000 along with "sweat equity" covered company expenses and payroll. By using "sweat equity" IVG was able to obtain valuable goods and services without expending cash. According to Julian Ross (Ross), co-founder of nuGift.com, IVG was able to develop software similar to that of Buy.com, which cost $10 million to develop. IVG had computers and servers to store the e-commerce software that were acquired without incurring debt.

By August 2001 a summary of IVG Financial Statements shows that IVG only had $238 on hand. Ross testified that there was "more than $238 in the IVG bank accounts."

IVG's initial presence on the Internet was through the website nuGift.com, from which it offered about 8,000 different items for sale. nuGift's product offerings ranged from $2.95 glassware to $36.95 toys to $5,000 diamond engagement rings. IVG made $920.66 in 1999, $3,115.68 in 2000, and $2,653.90 in 2001.

In March 2000, IVG decided to combine its e-commerce platform with an outdoor company by acquiring Explore Media, Inc. (Explore) in an all-stock transaction. Explore had been founded in 1997 by two undergraduate students at the University of Colorado. Explore.com was the main asset of Explore; it was geared toward outdoor sports and adventure travel. Revenue came from

advertising by companies such as Patagonia, REI, and Park City Ski Resort, but explore.com did not offer any products for sale on the website.

Explore.com was successful and well respected; it received numerous awards and had a high volume of traffic. It had 1.5 million page views per month in 1998 and as many as 3 million per month in 2000-2001. Explore.com never made a profit and had less than $20,000 in cash on hand, which it had obtained via credit card. The plan was to combine exlore.com's outdoor niche with IVG's web based business to create a "one-stop shop" for adventure enthusiasts. Explore.com continued to receive internet traffic and generate some revenue through advertising.

Four individuals were given twelve-month employment contracts by IVG in exchange for their help in integrating explore.com with IVG's e-commerce platform. A downturn in the financial markets became a "significant deterrent to IVG obtaining any post first-round capital." By the fall of 2000 explore.com was still not selling products. IVG continued to lose money, had exhausted its working capital, and was pursuing discussions to sell off its assets.

In the course of his consulting activities, Ross met Magdy Elwany, the founder, CEO, and 100 percent shareholder of M&A. Elwany sold computer systems and related computer-networking products. In an effort to expand into web hosting, M&A formed Veedix Corporation, but had difficulty breaking into the web-hosting business. In August 2000, Elwany offered Ross a job as M&A's Vice-President of Strategy and Corporate Development. Ross's job was to raise equity capital. By the time of trial, M&A had 140 full-time employees and $77 to $80 million in annual sales. When Ross went to work for M&A he closed IVG's offices where the web servers were housed. M&A agreed to the following provisions relating to IVG and Ross:

> 1. Through Veedix, M&A will provide co-location, bandwidth and technical
> support for IVG's web infrastructure and sites until all these assets are acquired by
> another company(s);

2. [Ross] will join the M&A management team under terms and conditions established separately;

3. M&A *may* provide a web development position for one of IVG's developers, at M&A's sole discretion. If this is the case, he will be able to spend no more than a few hours per week helping to maintain IVG's web sites; and

4. [Ross] will be able to pursue the sale of IVG's assets during the next few months to ensure a return for IVG's investors.

In exchange for this partnership, IVG agreed it would allow M&A to use explore.com's name to attract web-hosting clients.

The IVG servers were moved to the research and development laboratory at M&A and could be accessed remotely over the Internet for limited purposes. Ross was the only person who thereafter physically worked on the servers.

During the first year Ross overhauled M&A's accounting systems, secured $2 million vendor credit, negotiated a $10 million master lease, and obtained a $9 million line of credit for M&A, but he did not secure equity investors.

IVG continued to lose money and had $62 in the bank on December 31, 2000. In June 2001, Ross wrote to the former Explore shareholders who had received IVG stock, reminding them that the financial downturn that began in early 2000 was preventing IVG from raising capital; he informed them that IVG's web assets were currently being housed at M&A Technology, Inc., and that IVG had hoped to launch its e-commerce platform on explore.com in time for the late 2001 holiday season, but as of August 2001 no products were available for sale on the site.

On the morning of August 28, 2001, M&A's accountant was reviewing the June and July, 2001 canceled checks when she discovered several checks with questionable signatures. Some of the checks had been signed in Elwany's name, but the signature was not his. Others had been signed in Ross's name even though Ross was not an authorized user on M&A's bank account. M&A's

accountant retrieved the backup materials for the questionable checks, and found that in all cases payment had been authorized by Ross in violation of M&A's financial control policy that prohibits a person who approves a payment from signing the check for that payment.

Elwany was not aware of the expenditures until he was shown the canceled checks. After meeting with Ross, Elwany informed Ross that his employment was terminated. Ross was followed to his office and watched while he cleaned out his desk. His keys to the M&A premises were retrieved and his electronic keys were canceled. Ross testified at trial that he had no idea on the day he was fired why he was being fired. Ross indicated that he learned about the alleged forgeries through an insurance company, when he was contacted about the forged checks. Ross testified that he was told "never to set foot near the building" and that the checks he did sign, using his own name, had been authorized by Elwany. The jury found that IVG did not commit forgery or theft.

Ross did not take IVG's servers with him when he was fired from M&A. Ross and an Explore witness testified that explore.com could not be accessed from the Internet as of the morning of August 29. The former president of Veedix, Perry Henderson, testified by deposition that he was told that the servers had been disconnected and that service was not to be restored, that he visually observed that the servers had been disconnected, and that this happened the same day Ross was terminated. Val Overbey testified that Henderson was not present that day, that the IVG server cabinet remained in the lab, plugged in with the lights on, for a year or more, and that Henderson saw it every day during that time. Ross indicated that he had called Elwany and e-mailed him "a dozen times" trying to determine why the servers were down. Ross also e-mailed Val Overbey asking if the servers has been unplugged; Overbey responded to Ross by e-mail, stating "yes."

IVG's computer forensic expert later determined that one of the nuGift "sequel servers" had been "shut down dirty" on August 30, 2001, at 2:04 p.m. This indication, by itself, would be

consistent with the server's having been unplugged. Through consultation with Microsoft, M&A's expert was able to determine that the server contained a data entry showing conclusively that the shutdown did not result from a loss of power, but rather from an operating system error that caused the server to freeze. As for the exact timing of the shutdown, the system log showed several events on August 29, before the system shutdown at 2:04 p.m. on August 30.

The hard disks of the web servers and the e-mail server were completely blank. IVG's expert testified that the hard drive contained nothing but zeroes on it and the drives had been wiped clean by an intentional act. There was a disagreement among the experts on whether this anomaly indicated that the disks had been deliberately wiped of data or that they had never actually been used to host explore.com.

As to Ross's efforts to retrieve the servers there was a conflict. Ross testified that when he learned the website was down, he called and e-mailed Elwany, who did not respond. Ross produced a purported e-mail exchange with Val Overbey:

> Yahoo! Mail Date: Sat, 1 Sep 2001 12:14:36 -0700 (PDT) From: "Julian Ross" < julianross@yahoo.com> Subject: RE: Network To: vro@macomp.com
>
> Val:
>
> I called him at his house, but he wouldn't talk to me. Would you at least tell me what he did with the equipment? Please.
>
> Julian
>
> -- Val Reaves Overbey <vro@macomp.com> wrote: > Yes. Contact Magdy for explanation.

Ross testified that prior to that exchange he sent the following: "Val, the websites are down. Did he unplug the servers?" Overbey denied ever receiving any e-mails from Ross about the servers. Ross was unable to locate the prior e-mails sent to Overbey on his computer.

Ross testified he repeatedly attempted to get the servers back. Val Overbey testified that Ross could have taken IVG's servers with him on August 28, and that M&A had no use for the servers, but that it never heard from Ross again about the servers despite substantial efforts to locate him. Neither Ross nor any attorney ever made a demand on M&A for return of the servers.

At the time of these events, the industry standard was to create daily backup of customer data, and web server applications on a CD or tape drive to be kept off-site and possibly on-site. No such system was in place. A backup system would have allowed explore.com to have restored its servers to operation within 24 hours at a cost of less than $1,000.

On October 15, 2002, IVG sued M&A on theories of breach of contract and negligent and grossly negligent bailment, and later amended its petition to include claims for promissory estoppel, conversion of IVG's servers, and negligent and grossly negligent bailment. M&A filed its answer and denial on November 11, 2002. On August 27, 2003, M&A filed a separate suit against Ross for conversion and theft in the 134th District Court and simultaneously sought leave to file a counterclaim and third-party claim in the IVG suit with the same allegations. Leave was eventually granted and the two suits were consolidated.

On September 11, 2003, M&A asked IVG's counsel to accept service of M&A's third-party petition against Ross. IVG's counsel responded in writing that under TEX.R.CIV.P. 38 it would be improper to accept service of the third-party petition before the trial court ruled on M&A's pending motion for leave to file the third-party petition. On August 13, 2004, after the trial court reset the hearing on the motion for leave to file the third-party petition, M&A had Ross served in the 134th case. Ross filed an answer on August 19, 2004 in the 134th District Court.

A hearing on the motion for leave was heard and granted on December 17, 2004, and on January 26, 2005, the two cases were consolidated. The trial court granted summary judgment for

Ross in a May 15, 2007 order on the grounds that service had not been diligently pursued.

The case was tried to a jury. The jury's verdict was as follows:

(1) IVG & M&A had reached an agreement on the terms set forth in PX1;

(2) M&A failed to comply with the agreement;

(3) M&A's failure to comply was not excused by waiver;

(4) the agreement was not procured by IVG's fraud;

(5) M&A converted IVG's property;

(6) IVG's damages from the breach of contract and from the conversion, including the difference between the market value of IVG before and after August 28, 2001, were $3,000,000;

(7) the harm to IVG from M&A's conversion resulted from malice;

(8) $6,000,000 in exemplary damages should be awarded against M&A;

(9) M&A committed theft of property valued at $20,000 or more;

(10) IVG did not commit forgery with intent to defraud or harm another; and

(11) IVG did not commit theft of property valued at $20,000 or more.

The trial court rendered judgment on the verdict for $3 million in actual damages, $6 million in exemplary damages, $1,213,767.12 in prejudgment interest, and $2,540.20 in costs, for a total of $10,216,307, and it denied M&A's motion for judgment n.o.v., for new trial, and for remittitur.

## II. DISCUSSION

The Appellant raises two issues on appeal. First, the Appellant argues that the award of damages against it was based on speculative damages. Second, the Appellant argues that the trial court erred in the granting of a partial summary judgment against it on its third-party claim against Ross.

### A. Speculative Damages

We review a no-evidence challenge by reviewing all the evidence in a light most favorable to the verdict and we must assume that jurors resolved all conflicts in accordance with the verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We will affirm the award of damages if it is supported by more than a scintilla of evidence. *Id*.

IVG's expert witness on damages was Alan Ratliff (Ratliff). He is a partner in the StoneTurn Group where he provides economic consulting, forensic accounting, and valuation services. He testified as an expert witness on IVG's value in July of 2001. Ratliff possesses both a Bachelor's and Master's Degree in Accounting. He also holds a doctorate of jurisprudence from Southern Methodist University. He graduated with honors in all three degrees. He has served as an adjunct professor at various times with several universities. Most notably, he served as an adjunct professor of law at the University of Houston and South Texas College of Law. He speaks around the nation several times per year on the issue of damages, and he has been published fifteen times over the past ten years on the issue of damages.

At trial IVG's contention was that it had been totally destroyed by the alleged conversion that occurred when the servers were erased and that but for this conversion, IVG would have launched its e-commerce platform and been profitable. Ratliff calculated damages using three different methods. He used a Market Method to value IVG at $3.5 to $4.8 million, an Income Method to value IVG at $2.6 million, and a Cost Method to value IVG at $1.4 to $1.8 million.

## 1. The Income Method

The primary approach used for the valuation of IVG's common stock is a Discounted Cash Flow (DCF) analysis. Ratliff's analysis was forward looking. He projected the cash flows for the last five months of 2001 through 2006. Each year's income statement projections are also broken down by month. The revenue forecast is based on determining the number of likely buyers of IVG's

services and by estimating the purchase price of those services. Under the DCF analysis, unique visitors, user sessions per visitor, page views per session, and each visitor's proclivity to purchase the company's products drive the computation of expected revenue. Ratliff projected that the number of unique visitors would increase from 125,000 in August 2001 to 867,244 in December 2006, an average growth rate of 3.1 percent. He forecasted page views at 7.0 to 10.0 percent, with the higher amounts coming during the holiday season of November and December. Merchantable impressions were forecasted to be a constant 3.0 percent per page. IVG's forecasted call-to-action was 4.0 percent, meaning that there is a 4 percent chance that a user would link to another page to purchase merchandise or trips. It was forecasted that between .05 to .3 percent would purchase trips and .075 to .6 percent would purchase gear. This would lead to response-rates sales per unique visitor ranging from .0372 percent in 2001 to .4415 percent in 2006.

The average cost per trip was estimated at $2,000 and grew to $2,621 while the average gear purchase grew from $150 to $197. Based on those assumptions Ratliff estimated an annual growth rate of 96.9 percent, 42.7 percent, 64.8 percent, and 106.0 percent for 2003 through 2006 for both trip and gear revenue, an overall annual average growth rate of 75.7 percent from 2002-2006. The gross revenue margin for trips was estimated to be constant at 22.5 percent and the gross revenue margin for gear was assumed to be 25.0 percent. Expenses were estimated to be $42,697 for the last five months of 2001, and expenses were estimated to be $463,353 for 2002. The dividend rate was discounted to 32.5 percent. This was based on an article that indicated that the return on Early Seed Venture Capital Investment Performance was between 32.0 percent and 34.5 percent. A summation of cash flow less the debt placed the value of IVG on July 31, 2001, at $2.6 million.

Appellant argues that the Income Method suffers from two fundamental flaws. First, he argues that IVG was a new and unproven enterprise, for which lost profits may not be recovered as

a matter of law. Second, he argues that even if such recovery were permissible in the abstract, Ratliff's analysis was incompetent because of his heavy reliance on unproven and speculative assumptions regarding the number of visitors to explore.com and their proclivity to purchase products.

### a. New and Unproven Enterprise

We agree that IVG was a new and unproven company and that it is pure speculation to say that IVG would have successfully launched its e-commerce platform on explore.com, let alone have become profitable.

Lost profits must be shown by competent evidence with reasonable certainty. *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001). At a minimum opinions or estimates of lost profits "must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained." *Id*. Normally, when conducting a lost profit analysis you look to past profits and adjust these numbers based on the surrounding circumstances to determine what the lost profit for a certain time period should be. *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

Where no history of relevant past profits exists, a historically unprofitable business must produce "some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty." *Helena*, 47 S.W.3d at 505. Where there are no past profits because the plaintiff is embarking upon a new and unproven enterprise, lost profits are not recoverable. *Texas Instruments*, 877 S.W.2d at 279. "The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost-profits." *Id*. at 280. Preliminarily, we agree with the Appellant that the DCF approach is subject to the requirements for establishing lost-profit damages. IVG has argued at trial and on appeal that its proof does not have

to meet the standards for lost-profit evidence, because it was seeking lost value rather than lost profits. IVG stipulated that is was not seeking lost profits at trial. Lost profits is a factor, which is involved in valuing a business. *Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 380 (Tex.App.–Fort Worth 2003, pet. denied). IVG argues that lost value is a restitution-based remedy aimed at restoring an injured party that which was lost. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). They also argue that lost value is a market-value remedy. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 860 (5th Cir. 2004). We agree; however, in a lost-value analysis, just as in a market-value analysis, lost profits of a business would be a factor to consider in determining its value. *Sawyer v. Fitts*, 630 S.W.2d 872, 874-75 (Tex.App.–Fort Worth 1982, no writ). Revenue forecasting as in a lost income analysis must be based on objective facts or data and established to a reasonable certainty. *Helena*, 47 S.W.3d at 505.

### b. Incompetent Analysis

Because Ratliff's Income Analysis is based entirely on speculation of future profits we find that his conclusion is not supported by competent evidence. The evidence established that IVG was not a profitable venture. In June 2001, Ross wrote to the former Explore shareholders who had received IVG stock, reminding them of the financial downturn that had begun in early 2000 and had prevented IVG from raising capital. IVG had hoped to launch its e-commerce platform on explore.com in time for the late 2001 holiday season, but as of August 2001 no products were available for sale on the site.

As of August 2001, IVG completely lacked the ability to sell merchandise on explore.com. IVG presented no evidence that it had products to sell or distribution contracts. IVG had no employees other than Ross and the initial players involved in exlore.com. IVG had no office space to house employees. It had no capital. The explore.com prospectus established a need for $480,000

in immediate capital to launch the online store and $750,000 in initial working capital. IVG only had $238 in the bank and Ross indicated that because of downward changes in the financial markets he was unable to obtain first-round financing.

Ratliff's conclusions that the company could make money or was ready to make a profit in the very near future are not supported by the evidence and are pure speculation. The Fifth Circuit, applying Texas Law, has indicated that when an expert does a lost-value analysis based entirely on the ability to make future profits, the profits analysis cannot be speculative. *Fluorine On Call, Ltd.*, 380 F.3d at 861. Success or the ability to even sell merchandise in this case was entirely dependent on the success of a new and unproven enterprise, and making any forecast of future revenues is speculative. *Texas Instruments*, 877 S.W.2d at 280. We agree that the opinion based on the Income Method cannot support the jury's award of $3 million.

## 2. The Market Method

Ratliff conducted his market approach by using multiples of gross revenue from other internet-based businesses that had been bought or sold and then applied those multiples to IVG's 2002 forecasted revenues. Based on searches from Bloomberg and Mergerstat, he found four transactions that were involved in online travel industry and had publicly-available financial information. The median revenue multiple of those four companies was 1.21 with an average multiple of 1.67. Applying those multiples to IVG's forecasted 2002 revenues yielded an implied value of $3.5 to $4.8 million. The same analysis was performed using the travel companies Orbitz, IAC/Interactive, Priceline.com, and Sabre Holdings. The median revenue multiple of these companies was 2.49 with an average of 2.35. Applying those multiples to IVG's forecasted 2002 revenues yielded an implied value of $6.7 to $7.1 million.

While we make no assessment of Ratliff's method of applying forecasted revenues to

multiples of companies in the same industry, which have been bought or sold, we find that his underlying revenue forecasting for IVG is unreliable because it is dependent on speculative income forecasting. Because the speculative income forecasting is an integral part of the Market Method approach, we find that this method also fails.

### 3. Cost Method

The cost method looks at what it would cost to rebuild IVG. Ratliff valued the hardware and software component at $.4 million. He valued the e-commerce platform at $1.8 million. At most, this supports a jury award of $2.2 million.

M&A argues that Ratliff erred by not calculating economic obsolescence. Specifically, M&A argues that business property only achieves full market value when it is capable of contributing to profit building. We find it unnecessary to discuss this issue because the cost method does not support the jury's award of $3 million in actual damages.

"In determining damages, the jury has discretion to award damages within the range of evidence presented at trial." *Gulf States Utilities Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (citing *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 352 (Tex.App.–Houston [14th Dist.] 2001, pet. denied)). Because both the income and market methods rely on speculative income forecasting and the cost method only supports an award of $2.2 million, the evidence is not legally sufficient to support an award of $3 million.

### 4. Other Evidence Supporting Award of $3 Million

In the alternative, IVG argues even if the expert testimony does not support the damages awarded, other sufficient evidence exists in the record to support the award of $3 million in damages. Namely, IVG's balance sheet shows stockholder equity of $2,367,267 ($30 Preferred Stock + $13,780 Common Stock + $2,947,744 Paid in Capital - $507,940 Accumulated Deficit Brought Forward - $86,347 Deficit For 2001 = $2,367,267). There was also testimony and an exhibit indicating that big corporations like Buy.com or Amazon.com's e-commerce platforms cost as much as $10 million to build.

When a party challenges the legal sufficiency of the evidence supporting an adverse finding

on an issue on which it did not have the burden of proof, it must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Myrex Indus., Inc. v. Ortolon*, 126 S.W.3d 548, 550 (Tex.App.–Houston [14th Dist.] 2003, pet. denied). We consider all the evidence in the light most favorable to the jury's finding of the disputed fact, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 810-11. One of the grounds for sustaining a "no evidence" point is when the record shows "the evidence establishes conclusively the opposite of [a] vital fact." *Id.* In reviewing factual sufficiency, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In conducting this review, we do not substitute our judgment for that of the jury, as they are the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819, 821.

We find that both the $2,367,267 in shareholder equity and the testimony that e-commerce platforms can cost as much as $10 million to build are both legally insufficient to support an award of $3 million. First, $3 million in damages is well outside the range of $1 to $2,367,267, which is the range for the shareholder equity. The jury only has discretion to award damages within the range of evidence presented at trial. *Gulf States Utilities Co.*, 79 S.W.3d at 566. Second, simply stating that some e-commerce software costs $10 million to develop does not make it so in this case. There is no logical comparison between Amazon.com and IVG. One is a large corporation and IVG is a small unproven entity. In fact, IVG's own expert valued IVG's e-commerce platform at $1.8 million. This evidence directly contradicts the assertion IVG's software could have cost $10 million to develop. Without demonstrating the similarities between a big corporation's e-commerce

software and a smaller company's e-commerce software, which was not done, the jury would have to guess what IVG's platform looked and operated like in comparison with Amazon.com's e-commerce software. Because this comparison would have to have been done without any evidence, we find that the jury was not justified in awarding damages on the $10 million figure. We find that shareholder equity and $10 million software development costs do not support the award of $3 million in damages.

## B. Summary Judgment

We review the trial court's summary judgment *de novo*. *See Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215-216 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Under Texas Rule of Civil Procedure 166a(c), the party moving for summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex. 2001); *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). However, we have previously held that a trial court's erroneous decision to grant summary judgment can be rendered harmless by subsequent events in the trial court. *See Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005); *Martin v. Martin, Martin & Richards, Inc.*, 989 S.W.2d 357, 359 (Tex. 1998).

M&A discovered that Ross had allegedly forged checks on August 28, 2001. On August 27, 2003, it brought a separate suit against Ross for conversion and theft. On August 28, 2003, M&A sought leave of court to file a counterclaim and third-party claim against Ross in the IVG main suit. Two weeks after seeking leave of court, M&A's counsel wrote IVG and asked if it would accept

service on Ross's behalf and stated that if not, "we will arrange for personal service on Mr. Ross." IVG replied that it would not accept service for Ross and that personal service on Ross prior to the grant of leave to file the counterclaim and third-party claim was improper under TEX.R.CIV.P. 38.

The Appellant faced several road blocks. In its attempt to obtain a hearing on its Motion for Leave, the motion was originally set for hearing on December 15, 2003, but was reset to February 13, 2004. On that date, the trial court conducted a hearing and took the motion under advisement. Between March and July M&A's trial counsel was unable to get a ruling on the motion. In August 2004, counsel was informed that the judge had misplaced his notes from the February hearing and requested that M&A reset the motion for hearing. The hearing was set for November 11, 2004 and vacated at IVG's request. The motion was finally reheard on December 17, 2004 and granted. IVG's and M&A's agreed motion to consolidate the cases was granted. Ross moved for a summary judgment asserting that there was lack of diligence in servce following the expiration of limitations. The trial court partially granted the summary judgment on statute of limitations grounds.

In assessing diligence, the relevant inquiry is whether the plaintiff acted as an ordinarily prudent person would have acted under the same or similar circumstances and was diligent up until the time the defendant was served. *Proulx v. Wells*, 235 S.W.3d 213, 216 (Tex. 2007); *see Tate v. Beal*, 119 S.W.3d 378, 381 (Tex.App.–Fort Worth 2003, pet. denied). Generally, the question of the plaintiff's diligence in effecting service is one of fact, and diligence is determined by examining the time it took to secure citation, service, or both, and the type of effort or lack of effort the plaintiff expended in procuring service. *Proulx*, 235 S.W.3d at 216; *see Webster v. Thomas*, 5 S.W.3d 287, 289-90 (Tex.App.–Houston [14th Dist.] 1999, no pet.). If the plaintiff's explanation for the delay raises a material fact issue concerning the diligence of service efforts, the burden shifts back to the defendant to conclusively show why, as a matter of law, the explanation is insufficient. *Zale Corp.*

*v. Rosenbaum*, 520 S.W.2d 889, 891 (Tex. 1975).

> Rule 38 of the TEX.R.CIV.P. provides, in relevant part, that:
>
> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party petition not later than thirty (30) days after he serves his original answer. Otherwise, he must obtain leave on motion upon notice to all parties to the action. . . . Any party may move to strike the third-party claim, or for its severance or separate trial.

TEX.R.CIV.P. 38.

We find that it was error for the trial court to grant summary judgment in favor of IVG. Under these specific facts we find that the failure to timely serve Ross was partially caused by the trial court itself. The first available hearing was December 15, 2003, four months after suit was filed. Over the next several months delays caused by the trial court and IVG prevented M&A from obtaining leave to serve Ross. We do not agree that M&A did not exercise diligence in serving Ross. His first obstacle was in obtaining a hearing on the Motion for Leave. The courthouse doors should not be closed on a party when failure to get a hearing is because of a busy docket and mistakes made by the trial court. We find that the trial court erred in granting Motion for Summary Judgment on those grounds. Whether M&A's explanation demonstrates diligence was a fact question for the trier of fact. *Proulx*, 235 S.W.3d at 216.

We next review whether the trial court's summary judgment was harmful. Occasionally, unique facts will allow an appellate court to find that summary judgment was harmless. *Progressive County Mut. Ins. Co.*, 177 S.W.3d at 921. One instance where an error is harmless is when subsequent jury findings negate an essential element of the summary judgment. *Id*. at 922-23. IVG argues that because the jury found it not liable for forgery and theft, and because Ross, the president

of IVG, was the person who M&A alleged took and forged the checks in question, the forgery and theft allegations have been conclusively decided. Under the facts of this case, the harmless error rule does not apply. It would be speculation for this Court to guess how a jury would find if Ross was tried in his individual capacity. Specifically, the jury was not instructed on how Ross's bad acts could have an impact on IVG's responsibility for the alleged theft and forgery.

"The general rule of corporate law is that officers of a corporation are insulated from personal liability arising from their activities performed in the scope of their duties for the corporation." *Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex.App.–Dallas 1993, writ denied) (citing *Delaney v. Fidelity Lease Ltd.*, 526 S.W.2d 543 (Tex. 1975)). "However, a corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the tortious conduct, either actual or constructive." *Id*. (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984); *K&G Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 793 (Tex. 1958); *Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex.Civ.App.–El Paso 1972, no writ)).

Because the jury charge did not inquire into Ross's knowledge or conduct, it is impossible for us to determine whether the jury believed Ross knowingly took and forged M&A checks. We find the granting of the summary judgment was harmful.

### III. CONCLUSION

For the forgoing reasons we reverse and remand this case for a new trial.


GUADALUPE RIVERA, Justice


August 12, 2009

Before Chew, C.J., McClure, and Rivera, JJ.