**Opinion issued July 3, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-24-00115-CV**

————————————

**LAUREN LUTKUS, Appellant**

**V.**

**LORENA GARCIA, INDIVIDUALLY AND AS NEXT FRIEND OF R.A., A MINOR, Appellee**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-03095**

---

**MEMORANDUM OPINION**

This personal injury case arises out of a car accident. Lorena Garcia, individually and as next friend of Roman Acosta, sued Lauren Lutkus for negligence. Lutkus did not contest liability, and therefore the jury only considered the amount

of damages to award. The jury awarded Garcia $15,000 for past medical expenses she incurred before Acosta turned eighteen, and it awarded Acosta $18,000 for past physical pain, $250,000 for future physical pain, $18,000 for past physical impairment, $200,000 for future physical impairment, and $162,500 for future medical expenses. The trial court signed a judgment ordering Lutkus to pay nearly $700,000 in damages to Acosta and Garcia.

In four issues, Lutkus argues: (1) legally and factually insufficient evidence supported the awards for future physical pain, future physical impairment, and future medical care because Acosta's medical expert presented conclusory testimony on causation; (2) legally and factually insufficient evidence supported the award of future physical impairment because the evidence demonstrated that Acosta remained physically active through the time of trial; (3) legally and factually insufficient evidence supported the award of future medical expenses because Acosta's expert testified about the *possibility* of future treatment, not the *probability*; and (4) the trial court erred by admitting the life expectancy tables prepared by the Center for Disease Control into evidence.

We modify the judgment of the trial court and affirm as modified.

## Background

On May 14, 2017, Michelle Garcia was driving with her nephew, Roman Acosta, to a family member's house to celebrate Mother's Day. Acosta, who was

2

fifteen years old at the time, was sitting in the backseat. While they were waiting to make a left turn, Lauren Lutkus rear-ended Garcia's vehicle. Acosta was wearing his seatbelt, but he still "jerked forward" with the force of the impact, and he hit his head on the headrest of the front seat. He did not immediately seek medical treatment, but several days later he started complaining about back and neck pain.

Several months after the accident, Lorena Garcia, Acosta's mother, sued Lutkus on Acosta's behalf and in her individual capacity. She asserted a negligence claim and sought both economic and noneconomic damages. On the day of trial in July 2023, the parties filed a Rule 11 agreement. Lutkus agreed to stipulate to liability for the accident, although she did not agree that Acosta's alleged injuries and damages were caused by the accident.

A jury trial proceeded solely on the issue of damages. Acosta testified that he started feeling pain within a few days after the crash. He told his parents about the pain, and they tried treating it with back massages and over-the-counter medication. These remedies provided "temporary relief" from the pain, but "eventually it would just come back." Lorena took Acosta to see a chiropractor eight days after the accident. The records from Acosta's initial visit include a history that states:

> The patient presents to this office on 05/22/2017, to begin physical therapy for injuries sustained as a result of a motor vehicle collision that occurred on 05/14/2017. The patient complains of neck, mid back, low back and left hip pain and discomfort. Following the accident, the patient states he has had difficulty with his daily activities. Patient is unable to [complete] his daily activities without experiencing pain.

3

Acosta went to physical therapy twice per week for approximately three months. The treatment helped, but the pain did not completely go away. Acosta "learned to deal with it," but he still experienced pain daily.

During physical therapy, the pain in Acosta's neck "was really starting to flare up," and his chiropractor recommended that he have an MRI done of that area. The MRI revealed that Acosta had three herniated discs in his neck.

Acosta enjoyed playing soccer on a team at his high school. Before the accident, he had not injured himself or had any pain or discomfort while playing soccer. After the accident, Acosta continued playing soccer, but he switched positions from forward to goalie to lessen the stress on his neck and back. Even with the change in positions, Acosta still experienced neck and back pain after games. Acosta played soccer for his remaining three years of high school. He also had a job during high school, was employed at the time of trial, and had attended some college classes.

Acosta continued doing workouts and stretches that his chiropractor had recommended, but pain in his lower back "started flaring up again more than usual" in January 2019. Lorena took Acosta to see Dr. Kenneth Berliner, an orthopedic surgeon. Dr. Berliner recommended that Acosta have an MRI on his lower back, which revealed another disc herniation. Dr. Berliner also recommended that Acosta have an epidural steroid injection—an injection of an anti-inflammatory steroid

directly into the space next to the discs and nearby nerves—and take part in additional chiropractic treatments, but Lorena and Acosta decided against both treatments.

As of the date of trial, more than six years after the accident, Acosta still experienced daily pain in his neck and back. He testified that on "most normal days it's pretty bearable"—a three on a scale of one to ten—but some days the pain flares up and spikes to a ten. Acosta gave an example of a "ten" day: in 2019 or 2020, he was bending over and vacuuming the backseat of his car at a carwash, but when he stood up, his "back just gave out on [him] and [he] just collapsed to the floor." He had to wait around 15 minutes before he was able to drive home. Acosta had these type of days "like once every two months, maybe." Acosta had tried to remain physically active—he went for walks and occasionally played sand volleyball with friends—but he did not go to the gym as often as before. He could still complete some household chores, such as sweeping and mopping, but he no longer mowed the lawn. He testified that he will "do stretches, workouts, anything [he] can possibly do to not have to get a surgery or an injection."

Dr. Berliner examined Acosta, and he also reviewed Acosta's chiropractic records and the results from the two MRIs. He testified that herniated discs are permanent conditions: treatments like physical therapy and epidural steroid injections can relieve pain from herniated discs, but they cannot cure the condition.

5

The pain can fluctuate, but the condition is likely to worsen over time. Dr. Berliner opined that the car accident was the "likely source" of Acosta's disc herniations, noting that herniated discs are not usual for a fifteen-year-old absent some form of trauma. Dr. Berliner saw no evidence that Acosta complained about neck and back pain before the accident, and he saw no evidence that Acosta ever reported a soccer injury.

With respect to future damages, Dr. Berliner testified that herniated discs could lead to "accelerated wear and tear" of the joints. He believed it was "likely" that Acosta would need additional medical treatment in the future. When asked what kind of treatment Acosta would likely need, Dr. Berliner testified:

> Well, what I've seen usually is that as people use these damaged discs, they wear down, they occasionally get inflamed and flare up. So the epidural steroid injections are useful for treating that. But, also, as we know, like right after the accident, physical therapy was also helpful to him. So I would expect that throughout the years he would probably treat with some physical therapy, some additional medications, such as an oral anti-inflammatory, possibly even maybe a muscle relaxer. But then on occasion he might need some epidural steroid injections for flare ups. And then, you know, as a last resort, like as things really progress much worse, if the disc really collapses or if the disc extrudes more in the direction of where [the] nerve is, then you might end up having to decompress that area by taking some of the disc material away from where the nerves are and that would require surgery.

He testified that a four-week course of physical therapy usually costs around $2,500; an epidural steroid injection usually costs around $5,000; surgery on the lower back

costs around $110,000; and disc replacement surgery in the neck costs around $125,000.

After the close of testimony, Acosta introduced the Center for Disease Control's "United States Life Tables, 2020," a part of the National Vital Statistics Report that broke down life expectancy by race and sex. Lutkus objected because Acosta offered the exhibit without any expert testimony "to give a foundation as to why this table was needed and [its] importance and what it means." The trial court overruled the objection and admitted the exhibit.

The jury charge contained two questions. The first question asked what sum of money would compensate Acosta for his injuries "that resulted from the occurrence in question" and instructed the jury to consider five elements of damages. The jury awarded Acosta $18,000 for past physical pain; $250,000 for future physical pain; $18,000 for past physical impairment; $200,000 for future physical impairment; and $162,500 for future medical expenses. Question two asked what sum of money would compensate Lorena, as Acosta's next friend, for Acosta's past medical expenses. The jury awarded $15,000 in response to this question.

The trial court signed a final judgment awarding both Acosta and Garcia damages and prejudgment interest. Lutkus moved for judgment notwithstanding the verdict and for a new trial, and this motion was overruled by operation of law. This appeal followed.

7

**Sufficiency of Evidence**

Lutkus challenges the legal and factual sufficiency of the evidence to support the jury's verdict in three respects. In her first issue, she contends that legally and factually insufficient evidence exists that the car accident caused Acosta's disc herniations, arguing that Dr. Berliner's testimony on this matter was conclusory. In her second and third issues, she contends that legally and factually insufficient evidence supports the three future damages awards: future pain, future physical impairment, and future medical expenses.

## A. Standard of Review

Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence to prove a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016). A legal sufficiency challenge fails if more than a scintilla of evidence supports the challenged finding. *Tex. Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Albert v. Fort Worth & W. R.R. Co.*, 690 S.W.3d 92, 97 (Tex. 2024) (per curiam). We view

the evidence in the light most favorable to the verdict. *Id.* We must credit evidence favorable to the finding if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *Crosstex N. Tex. Pipeline*, 505 S.W.3d at 613.

When determining whether evidence is factually insufficient to support a finding, we must consider and weigh all the evidence relevant to that finding. *Id.* at 615. If the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of the evidence, we will set aside the finding and order a new trial. *Id.* We may not substitute our judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.*

## B. Whether Sufficient Evidence Exists to Support Causation

To prevail on a negligence cause of action, the plaintiff must establish the existence of a duty, breach of that duty, and damages proximately caused by the breach. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). For a plaintiff to establish causation in a personal injury case, the plaintiff must prove that "the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries." *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015) (quotations omitted). For example, if the plaintiff seeks recovery of medical expenses, the plaintiff must show "'what all the conditions were' that generated the expenses and 'that all the conditions were caused by the accident.'"

*Id.* (quoting *Guevara v. Ferrer*, 247 S.W.3d 662, 669 (Tex. 2007)); *Guevara*, 247 S.W.3d at 666 ("Competent proof of the relationship between the event sued upon and the injuries or conditions complained of has always been required.").

Generally, expert testimony is necessary to establish causation regarding medical conditions that are outside the common knowledge and experience of jurors. *JLG Trucking*, 466 S.W.3d at 162 (quotations omitted); *see Guevara*, 247 S.W.3d at 668 (noting that causation of injuries such as bone fractures "and similar basic conditions" following car accident "can be within the common experience of lay jurors" and expert testimony is not necessary). Temporal proximity between the event and "subsequently manifested physical conditions" may be relevant and probative "when combined with other causation evidence." *Guevara*, 247 S.W.3d at 668. This Court has held that injuries such as herniated discs "are neither common nor the type of basic injuries for which expert testimony regarding the causal connection between an occurrence and a physical condition is unnecessary." *Lara v. Bui*, No. 01-21-00484-CV, 2023 WL 2249205, at *6 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.) (concluding that plaintiff needed expert testimony to establish causal connection between car accident and injuries including cervicalgia, lumbalgia, lumbar radiculopathy, and two herniated discs); *Sanchez v. Leija*, No. 01-19-00165-CV, 2020 WL 7349094, at *3 (Tex. App.—Houston [1st Dist.] Dec. 15, 2020, no pet.) (mem. op.) (concluding that ligament sprain of thoracic

and lumbar spine, back spasms, lumbar radiculopathy, and increased symptoms of PTSD "are neither common nor basic").

An expert opinion "must rest in reasonable medical probability" to constitute competent evidence of causation. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995). We determine whether the expert opinion rests in reasonable medical probability by considering the substance and context of the opinion rather than semantics or use of a particular term or phrase. *Id.* Mere possibility—rather than reasonable probability—of causation is no evidence. *Plunkett v. Conn. Gen. Life Ins. Co.*, 285 S.W.3d 106, 118 (Tex. App.—Dallas 2009, pet. denied). If the expert offers no basis for the opinion or the offered basis provides no support, the opinion is "merely a conclusory statement" and does not constitute probative evidence. *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010) (quotations omitted). "A claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Id.* (quotations omitted); *Plunkett*, 285 S.W.3d at 120 ("A conclusory statement is one that does not provide the underlying facts to support the conclusion.") (quotations omitted).

If the evidence demonstrates that there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence "excluding those causes with reasonable certainty." *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quotations omitted); *see Jelinek*, 328 S.W.3d at 536 ("[W]hen the facts

11

support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion."). We do not, however, require a plaintiff to "speculate about other possible unknown causes and then disprove them." *Bustamante*, 529 S.W.3d at 457 (quotations omitted); *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010) ("[A] medical causation expert need not disprove or discredit every possible cause other than the one espoused by him.") (quotations omitted).

At trial, Acosta relied upon the testimony of Dr. Berliner—an orthopedic surgeon who physically examined Acosta in January 2019, reviewed his chiropractic records from May through July 2017 and the results from Acosta's first MRI, and ordered a second MRI that Acosta obtained in March 2019—to establish causation. Lutkus argues that Dr. Berliner's testimony was conclusory and relied solely on temporal proximity, and the testimony was therefore legally insufficient to establish that the car accident caused Acosta's disc herniations.

Dr. Berliner testified as follows concerning causation:

Q. Do you have an opinion based on reasonable medical probability about whether this car crash of May the 14th, 2017, caused the herniated disc in Roman's neck?

A. Yes, sir.

Q. What is that opinion?

12

A. I mean, it's my opinion that based on the information I have that the motor vehicle accident is the likely source of his disc herniations in his neck and back.

Q. You anticipated my next question about the herniated disc in his low back. Do you have an opinion based on reasonable medical probability about whether the herniated disc that Roman has at the L5-S1 level of his low back was caused by this car crash of May 14th, 2017?

A. Yes, I do.

Q. What is that opinion?

A. It's my opinion that the herniation in his low back is the result of the motor vehicle accident that he sustained.

If this had been the extent of Dr. Berliner's testimony, then Lutkus's argument would be meritorious. As the Texas Supreme Court has repeatedly stated, "Bare or baseless opinions cannot support a judgment, even if there was no objection over their admission into evidence." *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004) ("An expert's bare opinion will not suffice.").

However, Dr. Berliner offered more than just his "bare opinion" that the accident caused Acosta's disc herniations. Dr. Berliner had treated patients who had suffered disc herniations following a car accident on "many occasions." He physically examined Acosta, and he reviewed Acosta's records from his course of treatment at the chiropractor, as well as the MRI of Acosta's neck that he obtained in June 2017, approximately six weeks after the accident. Dr. Berliner testified that

13

Acosta first visited the chiropractor on May 22, 2017, eight days after the accident, and he complained of pain in his neck, mid back, low back, and left hip. Acosta reported that he was unable to complete his daily activities without experiencing pain.

Dr. Berliner explained in detail the structure of the spine, the purposes of discs, what happens physically when a disc becomes herniated, and how a herniated disc can cause pain and discomfort. He testified that based on the June 2017 MRI of Acosta's neck and the March 2019 MRI of Acosta's lower back, there was no doubt that Acosta had four herniated discs. Acosta was fifteen years old at the time of the accident, and Dr. Berliner agreed that it was unusual for a fifteen-year-old to have herniated discs "absent some form of trauma." He stated that "[f]or just about every 15-year-old I would expect [MRI results] all to be normal," but Acosta had four herniated discs, which Dr. Berliner would not expect to see "had it not been for this car crash."

Additionally, Dr. Berliner had not seen any evidence that Acosta had any complaints about his neck or back before the May 2017 car accident.[1] Although Acosta played soccer, Dr. Berliner testified that he had seen no evidence—whether

---

[1]    Nor was any such evidence presented in the record. The record contains no evidence that Acosta suffered from any pre-existing injuries or conditions prior to the car accident. Both Lorena and Acosta testified that Acosta did not have any complaints about neck or back pain before the accident.

through statements by Acosta during his medical exam or "paper documentation" such as a school incident report—of a sports injury to suggest an alternative cause for the disc herniations. Instead, "all the documentation that [Dr. Berliner has] seen has stated that [Acosta's] pain began when he had the car accident." Both Lorena and Acosta testified that Acosta had not been injured while playing soccer prior to the accident.

Dr. Berliner supported his opinion by explaining how the herniations are not normal for a fifteen-year-old in the absence of trauma, how the onset of Acosta's complaints occurred such a short time after the accident, and how no alternate source of trauma had any support in the facts. Taken as a whole, his testimony adequately supplied a basis for his opinion that the car accident caused Acosta's disc herniations.

Lutkus rightly noted on cross-examination, and reiterates here, that Dr. Berliner had not considered a police report[2] and could not tell from the MRI when the disc herniations actually occurred. Those points are valid, and the jury had a right to take them into account when determining whether the accident caused Acosta's injuries, but they do not make the expert testimony conclusory. Dr. Berliner adequately explained the basis for his opinion. *See Windrum*, 581 S.W.3d at 768 ("A conclusory statement asserts a conclusion with no basis or explanation.");

---

[2]     Lorena testified that law enforcement was not called to the scene of the accident.

15

*Bustamante*, 529 S.W.3d at 462 ("An expert's testimony is conclusory if the witness simply states a conclusion without an explanation or factual substantiation."). His expert opinion testimony therefore constitutes sufficient evidence to support the findings of causation.

We overrule Lutkus's first issue.

## C. Whether Sufficient Evidence Exists to Support the Awards of Future Damages

### 1. Future Pain

A plaintiff may recover damages for future pain if the jury can reasonably infer that the plaintiff will feel physical pain in the future. *Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 761 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (op. on reh'g). Although the mere existence of an injury does not establish compensable pain and suffering, evidence of continuing pain can support an award of future pain, and evidence of "continually objective physical injuries precludes a take nothing verdict for future physical pain." *Gibbins v. Berlin*, 162 S.W.3d 335, 344 (Tex. App.—Fort Worth 2005, no pet.).

The process of awarding damages for "amorphous, discretionary injuries" such as pain and suffering "is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Primoris Energy Servs.*, 569 S.W.3d at 761 (quoting *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.)). Once the plaintiff establishes the existence of some pain,

"there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the fact finder." *Id.* (quoting *Figueroa*, 318 S.W.3d at 62). The jury has "a great deal of discretion" in awarding appropriate damages for pain and suffering. *Id.* (quotations omitted); *Figueroa*, 318 S.W.3d at 62 (stating that amount of damages awarded for pain and suffering is "necessarily speculative" and "each case must be judged on its own facts").

In challenging the jury's award of $250,000 in damages for future physical pain, Lutkus argues that Acosta "built his case on the theory that disc herniations were the sources of his pain," but Acosta provided only the conclusory testimony of Dr. Berliner that the accident caused Acosta's disc herniations. She argues that due to this conclusory testimony on causation, legally and factually insufficient evidence supports the award for future pain, and we must reverse this award.

As stated above, we disagree with Lutkus that Dr. Berliner's testimony concerning causation was conclusory. He adequately supported his opinion with facts. The record contains sufficient evidence that the accident caused Acosta's disc herniations.

Acosta presented sufficient evidence justifying an award for future pain. Dr. Berliner testified that herniated discs are permanent conditions. Acosta testified that more than six years after the accident, he still experienced daily pain in his neck and back. On "most normal days," the pain was "pretty bearable." Occasionally he might

17

go to the gym and do a push-up the wrong way, and then his "neck might start to hurt a little bit." Using a scale of one to ten, Acosta rated his daily pain at a three.

Acosta also testified that there were times when his pain flares up, and he rated his pain at a ten on these occasions. As an example, he referred to an incident from three or four years before the trial when his back gave out at a car wash. He experienced these bad days "[m]aybe like once every two months, maybe." Acosta testified that the physical therapy sessions with the chiropractor helped ease his pain, but the pain did not completely go away during or after treatment.

The jury awarded Acosta $250,000 for future pain. Although this award may look on the high side, the jury had the right to see and hear the witnesses, and to evaluate their credibility. *See Golden Eagle Archery*, 116 S.W.3d at 761. The jury also has a "great deal of discretion" in determining the amount of damages for future pain. *See Primoris Energy Servs.*, 569 S.W.3d at 761 (quotations omitted). We conclude that legally and factually sufficient evidence supports the jury's award of damages for future pain.

### 2. Future Physical Impairment

Physical impairment is also called "loss of enjoyment of life," and this element of damages encompasses the loss of the injured party's former lifestyle. *Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 312 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *Figueroa*, 318 S.W.3d at 64. Generally, a

18

plaintiff must show that his physical impairment damages are "substantial" and that they "extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity." *Figueroa*, 318 S.W.3d at 64. "[I]f other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life." *Golden Eagle Archery*, 116 S.W.3d at 772.

The jury charge did not define physical impairment. *See Primoris Energy Servs.*, 569 S.W.3d at 758 (stating that because charge did not define "physical impairment," court would measure sufficiency of evidence against commonly understood meaning of terms, with "physical" commonly meaning "of or relating to the body" and "impair" commonly meaning "to diminish in quantity, value, excellence, or strength") (quotations omitted). The charge did, however, instruct the jury not to "award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any."

Acosta testified that he still experiences daily pain, but recovery for physical impairment requires evidence of an injury "beyond" such pain. *See Figueroa*, 318 S.W.3d at 64. On appeal, he argues that he "can no longer mow the yard." A more precise statement would be that he *does* not do so, rather than that he *cannot* do so:

Q. As we sit here today and after the crash, are there some activities that you either no longer can do or if you do it you have to experience pain?

A. Just some daily activities, just like chores around the house that I still kind of do, sweeping and mopping. We don't have like a normal dust pan. I have to get on the floor and do it. That hurts. Mowing the lawn, I don't do that anymore. My brother does it.

Q. Why is that?

A. I complained about it a lot to my mom so it was just assigned now your brother is going to mow the lawn, do outside; you'll clean inside.

Q. Now, when you say you complain about it, you complain because it was hot outside or were you complaining because of the pain?

A. It was both.

Michelle and Lorena both testified that prior to the accident, Acosta was very active outside and in sports, but after the accident, he "wasn't as active," he "would stay in more," and he was "more of a homebody after that." Acosta enjoyed playing soccer, and although he did not play in a summer league immediately after the accident, he switched positions from forward to goalie and continued playing soccer for school teams during his remaining three years of high school. Acosta maintained good grades throughout high school, and he had attended some college. Although he was not attending college classes at the time of the trial, he was planning to return.[3] He also had a job during his later high school years, and he was working as a server

---

[3] Acosta testified that he "[d]ecided to take a break [from college], just had a lot of stuff going on in [his] life." He did not testify that the break was due to his injuries.

20

at a restaurant at the time of trial. On the advice of his chiropractor and Dr. Berliner, he continued going to the gym—albeit not "as often anymore"—and doing various exercises, stretches, and weightlifting. He continued to have a social life, and he sometimes played sand volleyball with friends.

This testimony does not show that Acosta's physical-impairment damages "extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity." *See id.* We therefore conclude that legally insufficient evidence supports the jury's award of damages for future physical impairment, and we must delete this element of damages.

### 3. Future Medical Expenses

"An award of future medical expenses is, by its very nature, not a matter of certainty." *Gunn v. McCoy*, 554 S.W.3d 645, 670 (Tex. 2018). Texas law does not require "absolute certainty" to award future medical expenses, but it does require the plaintiff to show a "reasonable probability" that such expenses will be incurred. *Finley v. P.G.*, 428 S.W.3d 229, 233 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("[T]o sustain an award of future medical expenses, the plaintiff must present evidence to establish that in all reasonable probability, future medical care will be required and the reasonable cost of that care.").

A jury may base its determination of damages for future medical expenses on the injuries suffered, the medical care the plaintiff received before trial, the progress toward recovery under the treatment received, and the condition of the plaintiff at the time of trial. *Finley*, 428 S.W.3d at 233 (quoting *Rosenboom Mach. & Tool*, 995 S.W.2d at 828). An award of future medical expenses rests within the sound discretion of the jury. *Rosenboom Mach. & Tool*, 995 S.W.2d at 828; *see Finley*, 428 S.W.3d at 234 (stating that because this award "lies largely within the factfinder's discretion," courts are "especially hesitant" to disturb factfinder's conclusion) (quotations omitted).

Dr. Berliner provided the key testimony on this question. As mentioned above, he testified that herniated discs are "most likely to get worse over time," and he agreed that Acosta's "spine is more susceptible to further injury than it would be if he didn't already have these herniated discs." He also testified about the likelihood of Acosta needing future medical treatment:

> Q. Do you—can you tell us whether you think that Roman in the future as he ages is going to need—is likely to need medical treatment?
>
> A. I think that's likely.
>
> Q. What type of medical treatment do you think is likely that Roman is likely to need for his herniated discs as he ages?
>
> A. Well, what I've seen usually is that as people use these damaged discs, they wear down, they occasionally get inflamed and flare up. So the epidural steroid injections are useful for treating that. But, also, as we know, like right after the accident, physical

22

therapy was also helpful to him. So I would expect that throughout the years he would probably treat with some physical therapy, some additional medications, such as an oral anti-inflammatory, possibly even maybe a muscle relaxer. But then on occasion he might need some epidural steroid injections for flare ups. And then, you know, as a last resort, like as things really progress much worse, if the disc really collapses or if the disc extrudes more in the direction of where [the] nerve is, then you might end up having to decompress that area by taking some of the disc material away from where the nerves are and that would require surgery.

Q. So as you're sitting here today, the physical therapy that you're talking about for say one—one bad flare up, what would that cost in today's dollars?

A. Well, that—we usually do a short course of physical therapy so use about 12 sessions over four weeks, and that would typically cost somewhere around—about $2,500, about.

Q. And the epidural steroid injection, if he has a really bad flare up he needs an epidural steroid injection, what would that cost in today's dollars?

A. That usually runs about 5,000.

Q. And the surgery you're talking about, a decompression surgery—he's too young for any orthopedic surgeon to do a surgery on him now; is that right?

A. I mean, we treat the patients as they come. And, you know, if he meets the indications, you know, we—we would if we had to. But right now, his discs haven't progressed that severely yet. So, I mean, I'm not making that recommendation now but not that he's too young. If he had a larger disc herniation, I'd operate on him. But that said, I could foresee in the future that his back or neck could progress, you know, sufficiently to require that.

Q. And what—what would the cost in today's dollars be of a surgery like that?

A. Well, for the—for the lumbar that would typically run somewhere around $110,000 for the hospital and the surgeon,

23

anesthesiologists and all the equipment and everything. And as far as the neck, I would do a total disc replacement for that or disc replacement surgery in the neck and that usually runs about 125,000.

Acosta testified that he will "go to the gym, do stretches, workouts, anything [he] can possibly do to not have to get a surgery or an injection." However, "[i]f needed, [he] would do it."

An award of future damages "is always [somewhat] speculative." *McDaniel v. Dindy*, 673 S.W.3d 24, 38 (Tex. App.—Fort Worth 2023, no pet.) (quotations omitted). Even with that consideration, however, Dr. Berliner's testimony is too speculative to support any recovery beyond $2,500 for physical therapy. The testimony does put a price on other treatments if they ever become necessary, but it does not give any reason to believe that such other treatments will, in reasonable probability, be necessary. "If he had a larger disc herniation," there would be a surgery. And "if he has a really bad flare up," there would be an epidural steroid injection. Discs wear down over time, and a disc with enough damage will "occasionally" get inflamed and require such an injection. Likewise, surgery would be necessary "if the disc really collapses."

This testimony does not clear the hurdle required by the jury charge and Texas law.[4] *See Rosenboom Mach. & Tool*, 995 S.W.2d at 828 ("[T]o sustain an award of

---

[4] On appeal, Acosta also relies on this testimony from Dr. Berliner to support the award for future physical impairment, arguing that Acosta "will be treating his discs

future medical expenses, the plaintiff must present evidence to establish that in *all reasonable probability*, future medical care will be required and the reasonable cost of that care.") (emphasis added). Evidence that "merely suggested the possibility of a need for future treatment, rather than a probability" is legally insufficient to support an award for future medical expenses. *See Lara*, 2023 WL 2249205, at *7–8 (concluding that doctor's testimony that plaintiff "could possibly need one to three [epidural steroid] injections per year if his pain comes back and is increased" was conditioned on plaintiff's pain "returning and increasing" and was legally insufficient to support award of $150,000 for future medical expenses); *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 905–06 (Tex. App.—Texarkana 2004, pet. denied) (reversing award of future medical expenses because "[t]here was no testimony [the plaintiff] would require any additional medical procedures in the future beyond mere possibilities").

The evidence here is sufficient to support an award of only $2,500 for future medical expenses, and we therefore reduce the jury award of future medical expenses from $162,500 to $2,500. *See LaSalle Pipeline L.P. v. Donnell Lands, L.P.*,

---

herniations in some manner for the rest of his life which may include medications, epidural steroid injections, physical therapy and potentially surgery if the herniated discs collapse." We have concluded that Dr. Berliner's testimony about future medical treatments is too speculative to support the future medical expenses award. Likewise, we conclude that this testimony is too speculative to support the future physical impairment award.

336 S.W.3d 306, 321 (Tex. App.—San Antonio 2010, pet. denied) (reducing award of damages for fair rental value of temporary workspace easements from $19,206 to $6,402 when evidence was sufficient only to support lower amount).

We sustain Lutkus's second issue in part and her third issue.

## Admission of Evidence

Finally, in her fourth issue, Lutkus argues that the trial court erred by admitting the CDC's life expectancy tables into evidence.

Before Texas adopted the rules of evidence in the 1980s, life expectancy tables had a long history of being regarded as admissible in personal injury actions. *See, e.g.*, *Universal Life & Accident Ins. Co. v. Sanders*, 102 S.W.2d 405, 408 (Tex. [Comm'n Op.] 1937) ("Generally such tables are admissible in evidence, not as conclusive proof, but as some evidence of life expectancy . . . ."); *Galveston, H. & S.A. Ry. Co. v. Johnson*, 58 S.W. 622, 624 (Tex. App.—San Antonio 1900, writ ref'd) ("Courts have been very indulgent in allowing mortality tables as evidence. . . . Life tables are never taken as fixing the expectancy of life of the particular person, or as forming a legal basis for a calculation, but are accepted as furnishing some evidence to be considered by the jury, in connection with all the other pertinent evidence, in ascertaining the probable duration of the life in question."); *see also Voronin v. Voronin*, 662 S.W.2d 102, 107 (Tex. App.—Austin 1983, writ dism'd) (using United States Decennial State Life Tables to take judicial

notice that forty-eight-year-old party "had a life expectancy, as a Texas male, of twenty-four more years"). Nothing in the rules of evidence changed this practice. The trial court did not err in admitting the life expectancy tables.

Furthermore, even if the trial court did err by admitting the life expectancy tables, Lutkus has not shown any harm. Courts have held that life expectancy tables "are only one factor to be weighed in determining how long a person might live and are not of themselves determinative of the expectancy of every person." *See Harwell & Harwell, Inc. v. Rodriguez*, 487 S.W.2d 388, 400 (Tex. App.—San Antonio 1972, writ ref'd n.r.e.). Even when life expectancy tables are admitted, the jury "can find that a particular individual will probably live for a different number of years." *Id.*; *see Armellini Express Lines of Fla., Inc. v. Ansley*, 605 S.W.2d 297, 311 (Tex. App.—Corpus Christi–Edinburg 1980, writ ref'd n.r.e.) (stating that life expectancy tables "are based upon averages and are not binding upon the jury" and jury may exercise "considerable personal judgment as to how far such opinions are to be relied upon"). The jury surely understood that the tables merely offer a statistical guide for society as a whole. Admitting the tables, even if it had been improper, did not cause any harm.

We overrule Lutkus's fourth issue.

## Conclusion

We modify the judgment of the trial court to delete the $200,000 award for future physical impairment damages and to reduce the $162,500 award for future medical expenses to $2,500. We affirm the judgment as modified.

David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.